# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2020

Lyle W. Cayce
Clerk

No. 18-50793

UNITED STATES OF AMERICA,

　　　Plaintiff - Appellee

v.

JOHN XAVIER PORTILLO, also known as John Portillo; JEFFREY FAY PIKE, also known as Jeffrey Pike, also known as Jeffrey F. Pike,

　　　Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, HIGGINSON, and ENGELHARDT, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

In 2018, following a three-month-long jury trial, defendants-appellants Jeffrey Pike and John Portillo were convicted of multiple counts related to a RICO conspiracy. Their convictions arise out of their positions as high-ranking officials with the Bandidos Outlaws Motorcycle Club, a "one-percent" motorcycle club with deep roots in Texas. In this direct appeal, they urge a variety of errors related to the district court's pretrial procedures, the admissibility of certain evidence, and the sufficiency of the evidence. For the following reasons, we AFFIRM.

No. 18-50793

## I. General Factual Background

We begin with an overview of the evidence presented at trial, recounting the facts in the light most favorable to the jury's verdict. *See United States v. Mahmood*, 820 F.3d 177, 181–82 (5th Cir. 2016).

### A. The Bandidos Outlaws Motorcycle Club

The Bandidos Outlaws Motorcycle Club ("Bandidos") is an international motorcycle club with approximately 1100 members worldwide. Members of the club describe it as a "one percent" motorcycle club—a designation that signifies loyalty, brotherhood, and commitment. According to Special Agent Scott Schuster, the government's expert witness, the "one percent" classification is a way for the Bandidos to "brand[] themselves as . . . outlaw[s]." Johnny Romo, a member of the Bandidos, explained at trial that the "one percent" term means that "we're above all the other clubs." Though there are other one-percent motorcycle clubs in the country, the Bandidos consider themselves "the most dominant."

The Bandidos use a variety of symbols to identify themselves to one another and to outsiders. Members of the club wear a three-piece patch, which includes an emblem of a cartoon character known as "the fat Mexican." In the emblem, the character is depicted holding a semi-automatic pistol and a machete. The bottom section of the patch, known as the "bottom rocker," identifies "the territory that [each] Bandido is going to claim." In Texas, for example, the bottom rocker indicates that a member belongs to a Texas-based chapter. The Bandidos closely guard the integrity of the bottom rocker, and only allow full members of the club to wear the three-piece patch. Before becoming an official member, prospects can join support clubs, which are "a stepping stone to get closer to the Bandidos." Once an individual becomes a full member, he has "patched in."

2

No. 18-50793

Though the Bandidos have chapters across the world, the club has a particularly strong presence in Texas. The club was founded in March 1966 in San Leon, Texas. At the time of trial, there were between 35 and 40 Bandidos chapters in Texas, with about 400 Bandidos members statewide. The Bandidos is the only major one-percent motorcycle club in Texas.

The Bandidos maintain a highly-organized management structure. Several national officers are responsible for organizing regular events, including an annual summer run and a spring birthday run. Local chapters are self-governing and largely autonomous, though they are required to pay dues to the national office to support the cost of the group's events. The national office includes a President, Vice President, Secretary, Treasurer, and several Sergeants-at-Arms. In addition to organizing events, national officers control the selection and distribution of patches. Patches are often distributed to acknowledge a member's sacrifices on behalf of the club.

Jeffrey Pike served as national President of the Bandidos from 2005 until 2016. Pike assumed this role after the group's former President, George Wegers, pleaded guilty to a RICO conspiracy. According to Schuster, the Bandidos President, also known as El Presidente, has "full authority to make decisions on a day-to-day basis." Some members of the Bandidos refer to the President's role as a "dictatorship." Pike disputes this characterization, and testified that the "individual chapters run themselves." Pike also testified that it was his goal as President to make the group "more mainstream" and "more family oriented" than it had been under Wegers's leadership.

In 2002, John Portillo was promoted from local chapter president of the San Antonio Bandidos chapter to national Sergeant-at-Arms. In that position, Portillo was responsible for protecting the group's national officers and managing relationships between local chapters and rival clubs. Pike selected Portillo as National Vice President, or El Vice Presidente, in 2013. Schuster

3

testified that the Vice President's "purpose" was to provide the President "with plausible deniability." In one recorded conversation introduced at trial, Portillo explained that he thought of himself as "Jeff's guy." "I'm here to protect [Pike] . . . . I'm gonna protect [him] from the fuckin bullshit that's going on." In another wiretapped conversation, Portillo was recorded explaining that he "don't make no majors without [Pike] knowing about it."

**B. Murder of Robert Lara**

In 2001, Jay Negrete, a member of the San Antonio Bandidos chapter, was shot and killed. At the time of Negrete's death, Portillo was president of Negrete's local chapter. Magenta Winans learned that Robert Lara was responsible for the killing, and she reported the tip to the club. Portillo instructed a group of Bandidos members, including Richard Merla, to "take care of" Lara. Merla and several other Bandidos lured Lara to a park, where they were told to wait for Portillo to give them the order to kill Lara. Once they got the order, they shot Lara at least twelve times. They did not stay on the scene to see if Lara was "moving or if he was dead or alive." They got back in their truck and drove to the home of Portillo's brother, who was a member of a Bandidos support club. Lara was later found dead by the police.

When Merla next spoke with Portillo, Portillo told him that he could never talk about Lara's murder. Merla gave Portillo the gun used to shoot Lara, and Portillo burned it with a torch. Merla and the other Bandidos were awarded "Expect No Mercy patches," which were intended to honor members who "drew blood or shed blood for the club."

**C. Murder of Anthony Benesh**

In 2005, Anthony Benesh and his friend Carl Michael Burford decided that they wanted to start the first Hell's Angels chapter in Texas. Hell's Angels, another one-percent motorcycle club, had chapters across the United States, but not in Texas. Benesh got a Hell's Angels tattoo on his back, painted his

motorcycle red and white, and began wearing a motorcycle vest and jacket with an emblem that matched his tattoo. The patch on his vest identified him as "Vice President" of the Hell's Angels.

Burford testified that he traveled to Arizona to meet with Sonny Barger, the national president of the Hell's Angels, to get approval to start a Texas chapter. Barger denied this account, claiming that he would not have had the authority to approve a new Hell's Angels chapter. Benesh and Burford's actions quickly provoked anger from the Bandidos. Burford tried to avoid conflict by limiting his use of the Hell's Angels vest, but Benesh regularly wore his patch around Austin. Adrianna Faircloth, Benesh's girlfriend, testified that Benesh started receiving threatening calls about his display of the Hell's Angels patch.

Johnny Romo, a Bandidos member, testified that he learned about Benesh from Portillo. Portillo told him that there were two Hell's Angels "riding their bikes" in Austin. He explained that members of the local Austin chapter had "tried everything" to fix the problem, including "threats, intimidation, [and] fear." At the time, Portillo and Johnny were both Sergeants-at-Arms for the Bandidos national office. Portillo told Johnny that Pike had personally directed them to "take . . . out" Benesh and Burford. Johnny testified that Portillo told him "This came from Jeff Pike, we need to take them out." Johnny interpreted this order to mean that Portillo and Pike wanted him to "kill [Benesh], murder, to get rid of him." Johnny explained that the club wanted to stop Benesh and Burford because there "shouldn't be no other one percenters but the Bandidos in Texas."

Johnny testified that Portillo told him to assemble a group of Bandidos members and go to Austin. Johnny picked a few people he trusted to accompany him, including Robbie Romo, his brother. At the time, Robbie was a prospective member of the Bandidos who had not yet "patched in."

5

No. 18-50793

The day before the murder, Johnny and the other men drove from San Antonio to Austin to look for Benesh. They stayed outside Benesh's house until dusk, and then drove home to San Antonio. They returned to Austin the following day, and Robbie brought a rifle with him. They drove to Benesh's house, waited until he exited, then followed him and his family to a restaurant, where they parked outside. About an hour later, Johnny saw Benesh coming out of the restaurant and alerted Robbie. Robbie got his rifle ready by positioning it outside of the passenger's side window, aimed it at the driver's side of Benesh's truck, and shot the back of Benesh's head. Benesh was dead when the police arrived. Faircloth, Benesh's girlfriend, told the officers that she had warned Benesh "not to set up a Hell's Angel's chapter here." Johnny and the crew quickly fled the scene and immediately called Portillo from a pay phone to tell him "it's . . . done."

When Johnny saw Pike a few months later, Pike gave him a hug and a kiss and told him that he was "very proud" of him. After the murder, Robbie, who was a prospect at the time of the shooting, was allowed to "patch[] in early." Johnny was permitted to start an "underground chapter" of the Bandidos, the "Fat Mexican Crew," which answered directly to Pike. Johnny and the crew also received Expect No Mercy patches.

**D. Rivalry with the Cossacks**

The Cossacks are a motorcycle club based in North Texas. In 2014, Pike gave the Cossacks permission to add a Texas bottom rocker symbol to their patch. Pike believed this was a "natural transition for the club," and he hoped that the gesture would "open[] a line of communication between the two clubs." Eventually, however, the Bandidos became concerned that the Cossacks were displaying the bottom rocker in a "disrespectful" manner. Portillo told Johnny, "We're not going to fuck around with them Cossacks, dude, it's on." Justin Forster testified that he heard Portillo tell Pike that the group had to "do what

6

we got to do" to deal with the Cossacks. Pike responded, "Whatever y'all do, just be careful."

At trial, the government introduced evidence pertaining to several violent altercations between the Cossacks and the Bandidos.

- **Fort Worth, December 2014:** The Bandidos attacked Cossacks members at a Fort Worth bar using guns, clubs, and flashlights. During the attack, they took one man outside and shot and killed him. In a recorded call between Romo and Portillo after the incident, Portillo explained that the Bandidos were "at war with these mother fuckers."

- **Palo Pinto County, March 2015:** Arthur David Young, a member of the Cossacks, was at a gas station when he was approached by a group of Bandidos in a black car. When he refused to remove his vest, they hit him repeatedly in the head with a hammer.

- **Port Aransas, August 2015:** A group of Bandidos attacked several Cossacks members and their wives with beer bottles, knives, and other weapons. After the incident, Portillo was recorded saying that Pike "knows a little bit about it."

**E. Trial and Sentencing**

Following the government's fourth superseding indictment, a grand jury in the Western District of Texas returned a true bill charging Pike and Portillo with the following thirteen counts:

- **Count One:** RICO Conspiracy, 18 U.S.C. § 1962(d) (Portillo and Pike)
- **Count Two:** Murder in Aid of Racketeering (for the murder of Robert Lara), 18 U.S.C. §§ 1959(a)(1), 2 (Portillo)
- **Count Three:** Murder in Aid of Racketeering (for the murder of Anthony Benesh), 18 U.S.C. §§ 1959(a)(1), 2 (Portillo and Pike)
- **Count Four:** Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5) (Portillo and Pike)
- **Count Five:** Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(6) (Portillo and Pike)

7

No. 18-50793

- **Count Six:** Assault with a Dangerous Weapon in Aid of Racketeering (Palo Pinto County, Texas), 18 U.S.C. §§ 1959(a)(3), 2 (Portillo and Pike)
- **Count Seven:** Assault with a Dangerous Weapon in Aid of Racketeering (Port Aransas, Texas), 18 U.S.C. §§ 1959(a)(3), 2 (Portillo and Pike)
- **Count Eight:** Using and Discharging a Firearm During and in Relation to a Crime of Violence (murder of Robert Lara), 18 U.S.C. §§ 924(j)(1), 2 (Portillo)
- **Count Nine:** Using and Discharging a Firearm During and in Relation to a Crime of Violence (murder of Anthony Benesh), 18 U.S.C. §§ 924(j)(1), 2 (Portillo and Pike)
- **Count Ten:** Conspiracy to Distribute and Possession with Intent to Distribute 500 Grams or More of Methamphetamine and Cocaine, 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), (B) (Portillo)
- **Count Eleven:** Possession with Intent to Distribute Cocaine, 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) (Portillo)
- **Count Twelve:** Conspiracy to Interfere with Commerce by Threats or Violence, 18 U.S.C. § 1951 (Portillo and Pike)
- **Count Thirteen:** Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1) (Portillo)

The case proceeded to a three-month-long jury trial in 2018. On May 17, 2018, the jury returned a verdict finding Portillo and Pike guilty on all counts. In 2018, Portillo was sentenced to two life sentences plus two consecutive terms of ten years on counts eight and nine. Pike was sentenced to one life sentence, plus a consecutive term of ten years on count nine. The defendants filed timely notices of appeal from their judgments and sentences.

## II. Discussion

### A. Sixth Amendment Right to Counsel

Portillo was indicted on December 16, 2015 and arrested on January 6, 2016. On the day of his arrest, Portillo had an initial appearance before a magistrate judge. Portillo argues that he was deprived of his Sixth Amendment rights because he was not represented by counsel during this appearance.

#### i. Standard of Review

Sixth Amendment claims are typically subject to de novo review. *See United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011). However, if a

defendant could have argued to the district court that he was deprived of his Sixth Amendment rights but failed to do so, we review the claim for plain error only. *See Burton v. United States*, 237 F.3d 490, 501 (5th Cir. 2000). Here, neither Portillo nor his counsel argued to the district court that he was deprived of his Sixth Amendment rights during his initial appearance. To establish plain error, a defendant must show a clear or obvious error that affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 734–35 (1993). If a defendant meets that standard, the court "should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018) (internal quotation marks and citation omitted).

### ii. Analysis

"In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *United States v. Pleitez*, 876 F.3d 150, 157 (5th Cir. 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 691–92 (1984)). The Supreme Court has explained that the right protected by the Sixth Amendment "is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). A prosecution commences with "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).

In *Rothgery*, the Supreme Court held that the Sixth Amendment right to counsel attached at the time of a defendant's "initial appearance before a

judicial officer." *Id.* at 199. As in Portillo's case, the initial appearance in *Rothgery* involved a formal notification of "the charge in the complaint, . . . various rights in further proceedings," and a determination of "the conditions for pretrial release." *Id.* (citing 1 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 1.4(g), p.135 (3d ed. 2007)). Portillo correctly relies on *Rothgery* for his assertion that his Sixth Amendment right to counsel attached during this hearing. *See id.*; *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Though Portillo's Sixth Amendment rights had attached by the time of his initial appearance, he was not necessarily entitled to a lawyer during the proceeding. Whether Sixth Amendment rights have attached is a separate inquiry from whether "counsel must be *present* at a postattachment proceeding." *Rothgery*, 544 U.S. at 211 (emphasis added); *see also Michigan v. Jackson*, 475 U.S. 625, 629 n.3 (1986), *overruled on other grounds by Montejo v. Louisiana*, 566 U.S. 778 (2009). After attachment occurs, a defendant "is entitled to the presence of appointed counsel during any 'critical stage' of the postattachment proceedings." *Rothgery*, 554 U.S. at 212.

"Neither the Supreme Court nor the Fifth Circuit have [*sic*] delineated all of the critical stages at which a defendant is entitled to the presence of counsel under the Sixth Amendment." *Pleitez*, 876 F.3d at 157. However, both courts have identified some general characteristics that help to determine whether a proceeding gives rise to a Sixth Amendment right to counsel. A critical stage is a "trial-like confrontation[] at which counsel would help the accused in coping with legal problems or meeting his adversary." *Rothgery*, 554 U.S. at 212 n.16 (cleaned up). During a critical stage, "the results of the confrontation might well settle the accused's fate and reduce the trial . . . to a mere formality." *Gouveia*, 467 U.S. at 189 (citation omitted). We have explained that "[a] stage is . . . 'critical' where circumstances indicate that

counsel's presence is necessary to ensure a fair process." *Pleitez*, 876 F.3d at 157–58.

Portillo's initial appearance bears none of the markings of a critical stage. During the hearing, the magistrate judge briefly recited the facts of the indictment, the maximum penalties Portillo faced, and the government's intent to detain him without bond pending trial. The magistrate repeatedly warned Portillo not to "talk about the facts" of his case and confirmed that Portillo intended to hire his own attorney. Portillo was not forced to make any potentially incriminating statements that could jeopardize his defense, and he was not asked to make strategic decisions about his case. In short, Portillo's initial hearing did not pose the kind of difficult circumstances that "require[] aid in coping with legal problems or assistance in meeting [a defendant's] adversary." *McAfee v. Thaler*, 630 F.3d 383, 391 (5th Cir. 2011) (citation omitted).

We therefore hold that Portillo was not deprived of his Sixth Amendment rights during his initial appearance. *See United States v. Dohm*, 597 F.2d 535, 543 (5th Cir. 1979) ("The Constitution does not require that an accused have an attorney with him at his initial appearance before a magistrate."), *vacated in irrelevant part by United States v. Dohm*, 618 F.2d 1169, 1175 (5th Cir. 1980); *United States v. Lopez*, 426 F. App'x 260 (5th Cir. 2011); *see also United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1473–74 (11th Cir. 1992) (holding that an initial appearance is not a critical stage because it serves a largely administrative function), *abrogated on other grounds as recognized by United States v. Rainey*, 362 F.3d 733, 735 (11th Cir. 2004).

**B. Anonymous Jury**

Both defendants appeal the district court's decision to empanel an anonymous jury and impose a variety of safety measures. The court's order (1) prohibited jurors from revealing "their names, addresses, or places of

employment to the parties"; (2) required all jurors to be "kept together during recesses" and accompanied by the United States Marshals Service during lunch; and (3) ordered the United States Marshals to provide off-site parking and transportation for jurors to and from the courthouse.

### i. Standard of Review

A district court's decision to empanel an anonymous jury is reviewed for an abuse of discretion. *See United States v. Krout*, 66 F.3d 1420, 1426 (5th Cir. 1995). The district court must "base its decision on more than mere allegations or inferences of potential risk." *Id.* at 1427. In reviewing the district court's decision, the appeals court may refer to evidence elicited at trial, in addition to evidence presented before trial. *Id.* "[T]he use of anonymous juries will be upheld where evidence at trial supports the conclusion that anonymity was warranted." *Id.*

### ii. Analysis

Empaneling an anonymous jury "is a drastic measure[] which should be undertaken only in limited and carefully delineated circumstances." *Id.* "[T]his court [has] approved the use of anonymous juries only 'when needed to ensure against a serious threat to juror safety.'" *United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996) (quoting *Krout*, 66 F.3d at 1427).

In *Krout*, we identified a set of factors that "may justify jury protection by anonymity." 66 F.3d at 1427. These include:

> (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*Id.* (citing cases). In evaluating whether the district court abused its discretion in empaneling an anonymous jury, we look to the "totality of the circumstances." *United States v. Branch*, 91 F.3d 699, 724 (5th Cir. 1996) (citation omitted). Certain factors—such as "evidence that the defendant has in the past or intends in the future to tamper with the jury"—may be sufficient on their own to warrant an anonymous jury. *Id.*; *see also Krout*, 66 F.3d at 1427 n.7 (observing that "[a] lesser showing" on some factors "might be adequate where specific evidence exists linking the defendant to organized crime"); *United States v. Herrera*, 466 F. App'x 409, 424 (5th Cir. 2012) (affirming use of an anonymous jury even where there was no evidence on the third *Krout* factor).

Here, all of the *Krout* factors support the district court's decision to impose jury safety measures. First, the indictment charged both defendants with serving at the highest levels of an organized criminal group, demonstrating that their involvement in organized crime was "both deeply rooted and far-reaching." The allegations about the Bandidos closely resemble allegations about the Texas Mexican Mafia, the criminal group that was prosecuted in *Krout*. *See* 66 F.3d at 1427–28. Like the Texas Mexican Mafia, the Bandidos self-identify as "outlaws," and the evidence at trial established the highly structured nature of the organization, which frequently resorted to violence to assure its power in Texas motorcycle society.

The district court likewise did not abuse its discretion in concluding that the Bandidos had the capacity to harm jurors and had previously attempted to interfere with the judicial process and intimidate witnesses. At trial, the government introduced evidence that the Bandidos "instill a climate of fear of reprisal" for witnesses who cooperate with law enforcement. The culture of the Bandidos—including the "Expect No Mercy" patch and the group's history of encouraging violence against outsiders like Robert Lara and Anthony

Benesh—further underscored the potential danger to jurors. *See United States v. Riggio*, 70 F.3d 336, 340 n.22 (5th Cir. 1995) (holding that a history of witness threats provided a "reasonable basis to conclude that similar threats and attempts at intimidation were likely to be made to the jurors if their identities were known").

The fourth *Krout* factor—the potential that the defendants would face lengthy sentences and large monetary penalties if convicted—was easily met here. Six of the charges against the defendants carried maximum life sentences.

Finally, the district court did not abuse its discretion in concluding that there was a risk of significant media attention associated with this case. At the time of the district court's order, the case had already received considerable press coverage. And as the government points out, that publicity continued throughout trial. *See, e.g.*, *United States v. Edwards*, 303 F.3d 606, 614 (5th Cir. 2002) (citing "the intense media interest and highly charged emotional and political fervor that surrounded the trial" as a basis for anonymity protections); *Branch*, 91 F.3d at 724 (approving the use of anonymous jury where there was an "enormous amount of world-wide media attention generated by the case" and the trial "aroused deep passions" (cleaned up)).

In addition, the district court took care to provide a "neutral explanation" for the anonymity procedures, thus minimizing the risk of potential prejudice. *See, e.g.*, *Krout*, 66 F.3d at 1426 n.5; Am. Jur. 2d Jury § 184 (explaining the need to "giv[e] jurors a plausible and nonprejudicial reason for not disclosing their identities"). The court explained that the measures were "routine" and intended to ensure jurors' privacy. We have observed that similar explanations reduce the risk of prejudice to defendants. *See Riggio*, 70 F.3d at 340 n.23; *see also United States v. Ross*, 33 F.3d 1507, 1521 (11th Cir. 1994) (holding that the court's "careful instruction" about the need for the protections "eviscerated

any possible inference of Appellant's guilt arising from the use of an anonymous jury"). Likewise, the court required jurors to complete a supplemental questionnaire and allowed additional voir dire questioning, ensuring that the defendants "had access to a sufficient amount of information concerning each of the prospective jurors." *Herrera*, 466 F. App'x at 424; *see also Branch*, 91 F.3d at 724 (noting that "there is no showing that refusing to release the names and addresses of the jury prejudiced the defendants' ability to select an impartial jury").

For the same reasons, the security measures ordered by the court were not an abuse of discretion. In similar contexts, we have approved identical precautions, including driving jurors to and from the courthouse, and we have evaluated these measures using the same *Krout* factors identified above. *See Herrera*, 466 F. App'x at 424 (affirming the use of "off-site parking and transportation to-and-from the courthouse for the jury members"); *see also Ross*, 33 F.3d at 1519 (affirming district court order requiring jurors to "meet each morning in a central location to which federal marshals would return them at the close of the court day"). We therefore hold that the district court did not abuse its discretion in empaneling an anonymous jury and imposing security measures to protect the jury.

### C. Sufficiency of the Evidence

Pike argues that there was insufficient evidence presented at trial to support his conviction. Because Pike preserved his challenge by moving for acquittal under Federal Rule of Criminal Procedure 29, we review his claim de novo. *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017). This review is "highly deferential to the verdict." *Id.* (quoting *United States v. Cannon*, 750 F.3d 492, 506 (5th Cir. 2014)). An appellate court "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

### i. Count Three

Count Three charged Pike with aiding and abetting Anthony Benesh's murder in support of a racketeering enterprise, a crime under the Violent Crimes in Aid of Racketeering ("VICAR") Act. 18 U.S.C. §§ 1959(a)(1), 2. In order to establish a violation of this statute, the government must prove: "(1) an enterprise engaged in racketeering; (2) the activities affected interstate commerce; (3) a murder; and (4) the murder was committed for payment by the enterprise or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." *United States v. Owens*, 724 F. App'x 289, 296 (5th Cir. 2018) (cleaned up); *see also United States v. Velasquez*, 881 F.3d 314, 332 (5th Cir. 2018).[1]

"Proof that a defendant was merely associated with a criminal, or that [he] was present at the scene of a crime is not, without more, sufficient to sustain a conviction for aiding and abetting a criminal venture." *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978). "[A] person is liable . . . for aiding and abetting a crime if (and only if) he (1) takes an affirmative step in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014).

There was sufficient evidence presented at trial for the jury to find Pike guilty of Count Three. Johnny Romo testified that Portillo told him Benesh and Burford were riding their motorcycles in Austin, and that an order had come

---

[1] Pike primarily argues that the government did not establish that he was personally involved in Benesh's murder. However, he also makes a cursory argument that the evidence did not prove that he was involved in a racketeering enterprise, and he argues in his challenge to Count Twelve that the Bandidos' activities did not affect interstate commerce. As we explain below, we find the evidence sufficient to establish these other elements of the charges against Pike.

directly from Pike to "take them out." Johnny testified that he interpreted the phrase "take out" to mean "to kill him, murder, to get rid of him." Though Pike argues that this term could have referred to a violent act other than murder, it was within the province of the jury to interpret the meaning of the term and to conclude that Pike directed the brothers to kill Benesh. *See, e.g.*, *United States v. Jones*, 839 F.2d 1041, 1048 (5th Cir. 1988) ("The jury was entitled to interpret [the defendant's] words as evidence of conspiracy."). Robbie Romo, Johnny's brother, also testified that his brother told him that Pike was the person who "wanted this Hell's Angel killed."

The government also introduced substantial circumstantial evidence regarding Pike's role in the organization and the responsibilities of the Bandidos President. Portillo was recorded explaining that he "don't make no majors without [Pike] knowing about it." Referring to another incident, Portillo was recorded explaining that it would be "the end of me" if I "try to do that without Jeff's permission." Justin Forster, another Bandidos member, testified that "[a]ny significant decision making . . . falls on [the President]." There was also evidence introduced at trial demonstrating that Pike expressed support for Benesh's murder after it occurred, including by personally approving the creation of the "Fat Mexican Crew." *See Owens*, 724 F. App'x at 296 (explaining that the murder must be committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise" (citation omitted)). Collectively, this evidence was sufficient for a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *See United States v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001) ("Direct evidence of intent is not necessary to support a defendant's conviction.").

### ii. Count One

Count One charged Pike with a RICO conspiracy. To establish liability under the RICO Act, the government must prove "(1) that two or more people

agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

With respect to the first prong, there was sufficient evidence introduced at trial to show that Pike and other Bandidos members agreed to engage in a pattern of racketeering activity. 18 U.S.C. § 1962(c). Racketeering is defined in the Act to include a number of offenses relevant here, including "murder, robbery, . . . extortion, . . . or dealing in a controlled substance." § 1961(1). A pattern of racketeering activity is defined to include "at least two acts of racketeering activity." § 1961(5). There was ample evidence demonstrating that Pike made an agreement with other Bandidos to support these activities. This includes Romo's statement regarding Pike's order to murder Benesh and Justin Forster's testimony regarding Pike's knowledge of, and support for, the group's rivalry with the Cossacks. There was also substantial evidence introduced at trial showing that other Bandidos members met to discuss their agreement to commit murder, deal drugs, and engage in other related activities on behalf of the club. Even if Pike was not himself a party to these meetings, he can still be held liable if there is evidence that he "knowingly and willfully participated in the agreement." *Smith v. United States*, 568 U.S. 106, 110 (2013); *see also United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (en banc); *Posada-Rios*, 158 F.3d at 857. These activities fit within the definition of racketeering because they were intended to assure the supremacy of the Bandidos through murder, extortion, and drug dealing. *See, e.g., United States v. Henley*, 766 F.3d 893, 907–08 (8th Cir. 2014) (concluding that there was sufficient evidence of "racketeering activity" where "all of the predicate acts shared a similar purpose of asserting the dominance of the [group] and punishing those who committed real or perceived transgressions against the club or its members").

No. 18-50793

The evidence was also sufficient to establish that Pike knew of and agreed to the objectives of the RICO offense. The government introduced specific evidence establishing Pike's involvement in the Bandidos' criminal activities, including Johnny's statement about Pike's ordering Benesh's murder and Pike's endorsement of the war with the Cossacks. *See Owens*, 724 F. App'x at 296–97 (upholding a RICO conspiracy conviction where there was evidence of the defendant's "leadership role" in a criminal enterprise and his "involvement in" criminal acts committed by the group). There is also evidence in the record establishing that Pike ordered an "ass kicking" for Hell's Angels members in Connecticut who were causing conflict with the Bandidos. And, as the government points out, Pike's role as President placed him at the top of the Bandidos organizational chart, which provided powerful circumstantial evidence of his oversight of major decisions and activities taken by the group. We have explained that evidence of this kind is often relevant and highly probative in the context of a conspiracy charge.  *See Posada-Rios*, 158 F.3d at 857–58. Although Pike identifies contrary evidence in the record suggesting that he wanted to clean up the Bandidos' image, this evidence does not refute the persuasive evidence of guilt. *See, e.g.*, *United States v. Millsaps*, 157 F.3d 989, 994 (5th Cir. 1998) (observing that it is the "responsibility of the trier of fact fairly to resolve conflicts in testimony." (citation omitted)).

### iii. Count Nine

Count Nine charged Pike with aiding and abetting the discharge of a firearm in furtherance of Benesh's murder. 18 U.S.C. §§ 924(j)(1), 2. The jury was instructed that it could find Pike guilty of this count on a *Pinkerton* theory of liability. *See Pinkerton v. United States*, 328 U.S. 640, 645–48 (1946). Under *Pinkerton*, Pike could be found guilty as long as the use of the firearm was both reasonably foreseeable and in furtherance of the conspiracy. *Id.*; *see also United States v. Dean*, 59 F.3d 1479, 1490 (5th Cir. 1995) (upholding § 924(c)(1)

19

conviction under a *Pinkerton* theory of liability where there was no evidence that the defendants were aware that their co-conspirator was armed before he committed the crime).

As explained above, the evidence was sufficient for the jury to find Pike guilty of a RICO conspiracy. Because the evidence also supports the conclusion that Benesh was murdered as a punishment for a "real or perceived transgression[] against the club or its members," *Henley*, 766 F.3d at 907–08, the evidence was sufficient to find that Benesh was murdered in furtherance of the conspiracy. Finally, it was reasonably foreseeable that a firearm would be used to murder Benesh. *See United States v. Wilson*, 105 F.3d 219, 221 (5th Cir. 1997) (holding that a defendant can be held liable under *Pinkerton* "regardless of whether he had knowledge of or participated in the substantive acts"). As a result, there was sufficient evidence to support Pike's conviction on Count Nine.

### iv. Counts Four through Seven

Counts Four through Seven charged Pike with VICAR offenses related to the Bandidos' rivalry with the Cossacks. *See* 18 U.S.C. §§ 1959(a)(3), (5), (6), 2. Pike was found guilty of conspiring to commit murder and assault with a deadly weapon against Cossacks members in aid of racketeering (Counts Four and Five), aiding and abetting the Bandidos' assault of a Cossack in Palo Pinto County (Count Six), and aiding and abetting the assault of another Cossack in August 2015 in Port Aransas (Count Seven).

With respect to Counts Four and Five, there was sufficient evidence introduced at trial to show that Pike was aware of the Bandidos' disagreements with the Cossacks and that he endorsed the group's plans to address the problem through violence. *See Salinas v. United States*, 522 U.S. 52, 63 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."). When Portillo

explained that he wanted to "turn up the heat" on the Cossacks, Pike reportedly said "whatever y'all do, y'all be careful." In the same conversation, Pike agreed to "turn his back" on the Bandidos' future retaliatory actions. And in another conversation, Portillo explained that Pike told him to "play ball" and "batter up motherfucker" when discussing the group's plans for addressing the problem with the Cossacks in Crystal City. The government also introduced evidence of assaults and murders against Cossack members throughout Texas, including the murder of a Cossack associate during the altercation in Fort Worth and violent assaults in Port Aransas and Palo Pinto County. This evidence was sufficient to convict Pike even if there is no evidence that Pike agreed to the *specific* acts of the conspiracy. *See id.; Velasquez*, 881 F.3d at 332. Evidence presented at trial supported the conclusion that Pike made all major decisions for the group and therefore participated in the conspiracy. *See United States v. Salvatore*, 110 F.3d 1131, 1137 (5th Cir. 1997), *abrogated on other grounds by Cleveland v. United States*, 531 U.S. 12 (2000).

Likewise, the evidence was sufficient to find Pike guilty on Counts Six and Seven. The specific instances of violence in Palo Pinto County and Port Aransas were both reasonably foreseeable and in furtherance of the conspiracy. *See Pinkerton*, 328 U.S. at 645–48. These acts of violence were intended to punish the Cossacks for their perceived transgressions against the group. *See Henley*, 766 F.3d at 907–08. As a result, these acts were "the very essence of, and thus a reasonably foreseeable part of," the conspiracy. *United States v. Maceo*, 947 F.2d 1191, 1198 (5th Cir. 1991).

### v. Count Twelve

Finally, Count Twelve charged Pike with conspiring to interfere with interstate commerce by extortion or robbery, a violation of the Hobbs Act, 18 U.S.C. § 1951. To establish liability under this statute, the government need only show that interstate commerce was affected "in any way or degree." *Id.*

The government introduced evidence at trial showing that Pike authorized a plan for Bandidos to travel from Texas to New Mexico to violently confiscate patches from members who were challenging his authority. Justin Forster testified that Pike told him to "handle the problem" caused by these members. Forster traveled with a few other Bandidos members to New Mexico, where they "started beating everybody up" who refused to say that Pike was their President. Forster testified that he forcefully confiscated sixteen patches from defiant New Mexico Bandidos members, and they burned the majority of the patches and paraphernalia. Even if the patches belonged to the Bandidos and not to the disobedient individual members, this evidence was sufficient to convict Pike. *See United States v. Sturman*, 49 F.3d 1275, 1284 (7th Cir. 1995) ("One may be found guilty of extortion even for obtaining one's own property."); Lucas Martin, *Extortion, Blackmail, and Threats*, 31A Am. Jur. 2d Extortion, Blackmail, etc. § 96 (2020) ("A defendant's claim of right to property is irrelevant in an extortion case.").

We therefore hold that the evidence was sufficient to support Pike's conviction on all counts.

**D. Evidentiary Rulings**

The defendants challenge several of the district court's evidentiary rulings, arguing that the district court improperly admitted certain evidence and that the errors affected their substantial rights.

Where a defendant preserved his objection to the admissibility of the evidence, we review the district court's rulings for an abuse of discretion. *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Insaulgarat*, 378 F.3d 456, 464 (5th Cir. 2004). In criminal cases, the court's "review of evidentiary rulings . . . is necessarily heightened," and the court should ensure that the

evidence is "strictly relevant to the particular offense charged." *United States v. Anderson*, 933 F.2d 1261, 1268 (5th Cir. 1991) (citation omitted).

Where the defendant did not object to the admissibility of the evidence at trial, we review the claim for plain error only. *United States v. Bilbo*, 19 F.3d 912, 916 (5th Cir. 1994). "We find plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights." *United States v. Infante*, 404 F.3d 376, 394 (5th Cir. 2005). If these elements are met, the court "should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles*, 138 S. Ct. at 1905 (internal quotation marks and citation omitted).

### i. Agent Schuster's Expert Testimony

Over the defendants' objections, the district court granted the government's motion to introduce expert testimony from Special Agent Scott Schuster. The court explained that Schuster had taken time to develop his understanding of the Bandidos through years of investigation and conversations with insiders and outsiders, demonstrating that his understanding of the group was "far above that of the general public." Before bringing the jury back to the courtroom, however, the court placed limitations on Schuster's testimony. The court warned the government that Schuster would not be "allowed to give any direct opinion about the guilt or innocence . . . of any defendant in this case." If Schuster veered across that line, the court warned the government that there would be grounds to declare a mistrial. At trial, Schuster testified about the organizational structure of the Bandidos and the roles of each national officer. After the verdict was announced, the defendants moved for a new trial on the basis of Schuster's testimony, and the district court denied the motion.

No. 18-50793

Pike and Portillo both argue that the district court abused its discretion in admitting expert testimony from Schuster. They argue that (1) Schuster was not qualified to testify as an expert; (2) Schuster impermissibly restated inadmissible hearsay; and (3) Schuster violated Federal Rule of Evidence 704(b) by testifying to the specific mental state of the defendants.

First, the district court did not abuse its discretion when it held that Schuster was qualified to testify as an expert. Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may testify as long as (1) his "scientific, technical, or other specialized knowledge . . . will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based upon sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "he has reliably applied the principles and methods to the facts of the case." During voir dire, Schuster explained that he developed his knowledge of the Bandidos over twelve years as an FBI special agent, including eight years working on a task force investigating gangs and at least five years investigating the Bandidos in particular. His knowledge was based on interviews with current and former Bandidos members, document review, and collaboration with confidential informants.

We have previously approved the qualifications of experts who use their investigative training to testify about organized criminal enterprises like the Bandidos. In *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir. 1995), we affirmed the qualifications of two government agents who testified as experts about "the significance of certain conduct or methods of operation unique to the drug distribution business." Other circuits have similarly affirmed the qualifications of experts who use their law enforcement training to gain an understanding of insular criminal groups. *See, e.g.*, *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016); *United States v. Mejia*, 545 F.3d 179,

194 (2d Cir. 2008). These cases clarify that a law enforcement expert does not need "scientific" knowledge in order to be qualified as an expert; instead, "other types of specialized knowledge," including an investigative background, are often far more applicable in the context of a criminal organization. *Rios*, 830 F.3d at 413. Schuster's knowledge about the Bandidos was informed by years of on-the-ground investigative training. This training made Schuster's testimony reliable and sufficiently supported to be admissible at trial. *See id.* at 414; *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000).

Likewise, the district court did not abuse its discretion in concluding that Schuster's testimony would be helpful to the jury. In *Washington*, we held that the testimony of an "experienced narcotics agent" regarding "the significance of certain conduct or methods of operation unique to the drug distribution business" would be "helpful in assisting the trier of fact understand the evidence." 44 F.3d at 1283. Schuster's law enforcement expertise allowed him to "impart[] evidence regarding the inner-workings of organized crime, which has been held to be a proper subject of expert opinion." *Rios*, 830 F.3d at 413 (cleaned up). Other courts have similarly allowed law enforcement experts to testify about the structure of a criminal enterprise, including an insular group's insignia, history, culture, and organizational hierarchy. *See id.* at 413–14 (observing that "an FBI agent in a case about organized crime may properly give expert testimony on the structure, organization, and the rules of the organized-crime entity" (cleaned up)); *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014); *United States v. Van Dorn*, 925 F.2d 1331, 1338–39 (11th Cir. 1991).

Pike argues that Schuster impermissibly testified about easily verified facts—an area courts have declared off-limits for expert witnesses. *See Mejia*, 545 F.3d at 190 ("An increasingly thinning line separates the legitimate use of an officer expert to . . . explicate an organization's hierarchical structure from

the illegitimate and impermissible substitution of expert opinion for factual evidence."); *see also United States v. Haines*, 803 F.3d 713, 731 (5th Cir. 2015) (observing that the "aura of special reliability" given to experts creates a risk that the jury might place "undue weight" on the expert's testimony based on the "perception that the officer was privy to facts not presented at trial" (citation omitted)). Pike notes that Schuster testified about specific historical crimes committed by Bandidos, and argues that this testimony was fact-specific and not helpful to the jury. As the government argues, however, Schuster did not speak about "purely factual matters establishing the elements of the *charged* crime." *See Mejia*, 545 F.3d at 194–96 (holding that certain expert testimony about the defendant's alleged crimes was unhelpful because it was "well within the grasp of the average juror"). Moreover, Schuster was not the case agent who investigated Pike and Portillo, thus minimizing any prejudice potentially caused by his testimony. *See Haines*, 803 F.3d at 730–31; *United States v. Sykes*, 277 F. App'x 397, 398 (5th Cir. 2008) (dismissing claim that expert erroneously testified as both an expert and fact witness where there was no evidence that the "theoretical concerns" about a witness's dual roles prejudiced the defendants).

Second, Schuster did not impermissibly reveal hearsay during the course of his testimony. Under Federal Rule of Evidence 703, an expert can base his opinion on otherwise inadmissible facts and data, including hearsay, as long as these sources are "reasonably rel[ied] on" by experts in the field. Here, Schuster's reliance on hearsay evidence, including statements made by Bandidos members in interviews and intercepted phone calls, is "consistent with the ordinary practices of law enforcement officers, who routinely and reasonably rely upon hearsay in reaching their conclusions." *Mejia*, 545 F.3d at 197 (cleaned up). Schuster used his expertise to synthesize "various source

materials," rather than simply regurgitating information he learned from those sources. *See id.*

For the same reason, Portillo's Confrontation Clause argument also fails. Portillo did not object to Schuster's testimony on this basis, so we review this claim for plain error only. Portillo does not identify any "testimonial statements within the meaning of *Crawford v. Washington*, [541 U.S. 36 (2004),] or any impermissible hearsay at all, relayed by [Schuster's] testimony." *United States v. Akins*, 746 F.3d 590, 603 (5th Cir. 2014). As long as an expert forms his opinion by "*amalgamating . . .* potentially testimonial statements," his testimony does not violate the Confrontation Clause. *Rios*, 830 F.3d at 418 (emphasis added); *see also Akins*, 746 F.3d at 603.

Finally, the defendants argue that Schuster's testimony impermissibly opined on their mental states. Under Federal Rule of Evidence 704(b), an expert witness in a criminal case "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." We have interpreted Rule 704(b) narrowly, explaining that it only prohibits statements that "*directly* opine[] on the ultimate issue of [a defendant's] mental state." *United States v. Dvorin*, 817 F.3d 438, 448 (5th Cir. 2016) (emphasis added); *see also United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994) ("Rule 704(b) is not strictly construed and prohibits only a direct statement of the defendant's intent."); 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6285, at 395 (1997) ("Rule 704(b) usually bars only a direct statement that defendant did or did not have the required mental state.").

Pike argues that Schuster violated Rule 704(b) when he testified about the typical characteristics of the Bandidos President. According to Pike, this testimony was impermissible because it communicated the opinion that Pike "must have known of and participated in the charged offenses." He relies upon

our opinion in *United States v. Gutierrez-Farias*, 294 F.3d 657, 663 (5th Cir. 2002), where we held that a district court abused its discretion when it permitted expert testimony about the knowledge typically possessed by drug couriers. We explained that this testimony crossed the "borderline long recognized . . . between a mere explanation of the expert's analysis of the facts and a forbidden opinion on the ultimate legal issue in the case." *Id.* (cleaned up). Pike argues that Schuster's testimony veered across this line because it suggested that Pike, as President of the Bandidos, necessarily had knowledge of the activities of all of the club's members. However, he fails to identify any testimony from Schuster that "directly opined on the ultimate issue" of Pike's mental state. *Dvorin*, 817 F.3d at 448. In a similar context, we have held that expert testimony about the typical mental state shared by individuals in a specific criminal role does not violate the Rule 704(b) bar. *See United States v. Morin*, 627 F.3d 985, 996 (5th Cir. 2010).

Even if it was an abuse of discretion for the district court to admit this or any other part of Schuster's testimony, any error was harmless. Under the harmless error doctrine, "judgment will be affirmed . . . unless the error affected a substantial right of the defendant." *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010). "An error affects substantial rights if there is a reasonable probability that the improperly admitted evidence contributed to the conviction." *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007). The government bears the burden of establishing that the erroneous admission of evidence was harmless beyond a reasonable doubt. *United States v. Ebron*, 683 F.3d 105, 131 (5th Cir. 2012). An "error is harmless if, in light of the whole record, the contested evidence did not contribute to the verdict." *United States v. Dixon*, 185 F.3d 393, 398 (5th Cir. 1999).

Here, several other witnesses independently confirmed many statements made by Schuster about the authority of the President, the history of the

Bandidos, and the group's organizational structure and operations. We have explained that an error can be harmless when the improperly admitted evidence merely duplicates other evidence in the record. *See Akins*, 746 F.3d at 600 ("To the extent that certain portions of [the expert's] testimony at times crossed the line . . . it was cumulative of other testimony and therefore harmless."); *United States v. El-Mezain*, 664 F.3d 467, 513 (5th Cir. 2011); *Krout*, 66 F.3d at 1433. Likewise, any erroneously admitted testimony "constituted only a small portion of an otherwise strong case." *Gutierrez-Farias*, 294 F.3d at 663. The government introduced substantial evidence of guilt, further supporting the conclusion that any error was harmless. *See Washington*, 44 F.3d at 1283 (holding that an error is harmless if there is "overwhelming evidence establishing [the defendant's] guilt"). Against this backdrop, any errors in the admission of Schuster's testimony did not impact the defendants' substantial rights, and we therefore affirm.

### ii. Prior Consistent Statements

The defendants argue that the district court erred when it admitted three prior consistent statements during the trial. Pike and Portillo both argue that the district court erred when it admitted: (1) Johnny Romo's statement to law enforcement after he was arrested for the murder of Anthony Benesh, and (2) Robbie Romo's confession to law enforcement after he was implicated by his brother in Benesh's murder. Separately, Portillo argues that the district court erred when it admitted a confession Richard Merla gave to law enforcement after he was arrested for the murder of Robert Lara.

### a. Romo Brothers' Statements

After he was arrested on federal narcotics charges in 2014, Johnny Romo began cooperating with federal authorities. The government later learned that Johnny and his brother Robbie were responsible for the murder of Anthony Benesh, and they arrested Johnny on murder charges in March 2017. Johnny

gave a lengthy statement confessing to his involvement in the murder and implicating his brother as the shooter. The government later recorded a conversation between Johnny and Robbie during which Johnny encouraged Robbie to cooperate with the government. Immediately after that conversation, Robbie confessed to his role as the shooter.

Both of the Romo brothers testified at trial. During direct examination, they each implicated Pike and Portillo in Benesh's murder. On cross examination, the defendants cast doubt upon the reliability of the Romos' testimony, suggesting that the brothers were fabricating their stories in order to receive a benefit from the government.

Appellants point to no improper use by the government of the Romo brothers' prior consistent statements during direct examination. However, during cross-examination, both defendants asked the brothers about their confessions to law enforcement. During Portillo's cross of Johnny, Johnny admitted that he provided information about Portillo's involvement in the murder only after he communicated with Robbie. Pike's counsel also used portions of Johnny's conversation with the authorities during his cross examination, suggesting that Johnny had previously told the authorities that he did not intend to murder Benesh and only wanted to beat him up. During their cross of Robbie, the defendants used portions of Robbie's recorded confession to argue that Robbie had previously told law enforcement that he did not go to Austin with the intent to kill Benesh, casting doubt on the consistency of his story.

After Johnny testified, the district court granted the government's request to introduce Johnny's confession. The court held that this recorded statement was admissible as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B). The government introduced the video recording and the transcript of Johnny's conversation with the agents during its direct

examination of Chad Lloyd, one of the agents involved in the investigation of the Benesh murder.

Later, the court addressed the admissibility of Robbie's statement and also found that it was admissible as a prior consistent statement. The statement was introduced during the government's direct examination of Jeb Killian, another federal agent involved in the investigation.

### b. Richard Merla's Statement

Two years after Robert Lara was shot and killed in retaliation for killing a Bandidos member, Richard Merla was arrested for killing another man. While he was in jail, Merla confessed to killing Lara in 2002 and implicated Portillo in Lara's murder. On cross-examination, Portillo's counsel attacked Merla's credibility, suggesting that he implicated Portillo only because he was angry at him for expelling him from the Bandidos. Portillo also suggested that Merla's memory was unreliable and that there were inconsistencies between his in-court testimony and his prison confession. During the government's re-direct of Merla, the court allowed the government to introduce Merla's confession as a prior consistent statement. In his one-page confession, Merla stated that "[t]he murder of Robert Lara was planned and executed by Chapter President John Portillo of the Southwest Chapter of Bandidos."

### c. Analysis

The government argues that all three statements were admissible under Federal Rule of Evidence 801(d)(1)(B) or under Federal Rule of Evidence 106.

Federal Rule of Evidence 801(d)(1)(B) provides that a declarant-witness's prior consistent statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement," and the prior statement is offered for one of two reasons: "(i) to rebut an express or implied charge that the declarant recently fabricated [his testimony] or acted from a

31

recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

First, the government argues that the Romo brothers' statements were admissible under 801(d)(1)(B)(i) to "rebut the implication that the Romo brothers . . . had fabricated their testimony in the hopes of receiving a lower sentence under the terms of their plea agreements." In *Tome v. United States*, 513 U.S. 150 (1995), the Supreme Court explained that a prior consistent statement is admissible under this rule if "the statement [was] made *before* the alleged fabrication, influence, or motive came into being." *Id.* at 156 (emphasis added). If it was made after that motive arose, it is "inadmissible." *Id.* "Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because []he has been discredited." *Id.* at 157.

Here, the defendants' cross-examinations implied that the Romos created a falsified narrative in the hopes of receiving leniency from the government. Because this claimed motive to fabricate also existed at the time that the prior consistent statements were made, the admission of these statements under Rule 801(d)(1)(B)(i) violated *Tome. See id.* at 700. When Johnny and Robbie confessed to law enforcement, they were both arguably motivated by a desire to shift the blame onto Pike and Portillo in order to obtain the benefits of cooperation. Despite the government's arguments to the contrary, this motivation existed regardless of the fact that the brothers did not have specific plea agreements until well after they made their confessions. Indeed, at the time that Johnny spoke with law enforcement and implicated himself and his brother in Benesh's murder, Johnny had already told the authorities that he wanted to help his brother get a plea deal, and both brothers testified that they spoke with law enforcement with the full

awareness that they may be able to reduce their sentences through cooperation.

This same motivation—a desire to obtain the benefits of government cooperation—persisted at trial, distinguishing this case from cases where we have permitted the admission of prior consistent statements under *Tome*. In *United States v. Wilson*, for example, we allowed the government to introduce a letter written by a government cooperator years before his plea bargain, in which the cooperator implicated the defendant in drug crimes. 355 F.3d 358, 361 (5th Cir. 2003). We noted that the letter was written before the cooperator had a plea agreement; critically, however, it was also written "to a person who could not directly help [the witness] avoid prison time," thus eliminating the cooperator's motivation to lie. *Id.* (emphasis added). Unlike *Wilson*, the Romo brothers' prior statements were made to law enforcement—the *same* people who could help the Romos get the benefits of cooperation. Because the motive implied by the defendants—the brothers' desire to obtain leniency from the government—existed when the prior statements were made as well as at trial, the prior statements were inadmissible under 801(d)(1)(B)(i). *See United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001).

In the alternative, the government argues that all three statements were admissible under 801(d)(1)(B)(ii). Though it is not clear that the district court relied on this portion of the rule when it found the statements admissible, "[t]hat is not the end of our inquiry."[2] *United States v. Jensen*, 41 F.3d 946, 958

---

[2] In arguing that Johnny's confession was admissible, the government explained that Johnny's credibility had been "attacked on a number of grounds," but did not specifically cite Rule 801(d)(1)(B)(ii). The court then discussed the history of the 2014 amendment, but did not clearly indicate the basis for its admissibility holding. Later, when discussing the admissibility of Robbie's prior statement, the government explained that it was offering the statement as a "prior consistent statement" after Robbie was "attacked thoroughly on cross-examination," but did not explain the specific portion of the rule that gave rise to its argument.

(5th Cir. 1994). "If the evidence was admissible on any ground, the district court's reliance on other grounds does not affect the defendant's substantial rights." *Id.* Under 801(d)(1)(B)(ii), a prior consistent statement may be admitted "to rehabilitate the declarant's credibility as a witness when attacked on another ground." *Id.* Subsection ii was added to the rule in 2014 "to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory." Fed. R. Evid. 801 (Advisory Committee's Note to 2014 Amendment); *see also United States v. Flores*, 945 F.3d 687, 705 (2d Cir. 2019) (admitting prior consistent statement where defendant argued that the witness could not be trusted because the incident occurred long ago).

We do not agree that the Romo brothers' statements were admissible under 801(d)(1)(B)(ii). The government cites several instances where the defendants identified inconsistencies between the brothers' earlier statements and their testimony at trial. Specifically, the defendants suggested that the brothers' earlier statements diverged from their testimony on several points, including: (1) how Robbie got the gun, (2) how Robbie was selected to be the shooter, (3) when Portillo gave the order to kill Benesh, and (4) whether the plan was to kill Benesh or simply to threaten him. In all cases, however, these inconsistencies were identified by the defendants in order to make a broader point: that the brothers subsequently changed their stories in order to get favorable deals from the government. Throughout the cross-examinations, the defendants repeatedly suggested that the brothers coordinated their stories—and clarified previous inconsistencies—because they believed that they would only get "credit" if they could "point the finger at either John or Jeff or both." Put differently, the defendants accused the Romo brothers of inconsistency only to support their claim that the brothers fabricated their stories—a motive

that fits squarely within 801(d)(1)(B)(i), and not the alternative 801(d)(1)(B)(ii).

In the Advisory Committee's Note to the 2014 Amendment, the committee explained that "[t]he amendment does not change the traditional and well-accepted limits on bringing prior consistent statements before the factfinder for credibility purposes." Fed. R. Evid. 801 (Advisory Committee's Note to 2014 Amendment); *see also United States v. Magnan*, 756 F. App'x 807, 818 (10th Cir. 2018). The *Tome* limitation predates Rule 801 and was a well-established common law principle that was accepted by the drafters of the rule. *See Tome*, 513 U.S. at 161–62 (recounting history of rule).  In order to faithfully give effect to the drafters' intentions, courts must interpret Rule 801 with this rule in mind. *Id.* ("The Notes disclose a purpose to adhere to the common law in the application of evidentiary principles, absent express provisions to the contrary."). If the *Tome* limitation is mapped on to Rule 801(d)(1)(B)(ii), a litigant may not introduce a prior consistent statement if that statement was made at a time when the litigant allegedly had a motive to fabricate—even if the litigant supplements his attack on the witness's credibility by pointing to other flaws in the declarant's testimony.

Here, the plain language of 801(d)(1)(B)(ii) precludes the admission of the prior consistent statements under these circumstances because the defendants did not attack the Romo brothers on "another ground." By permitting the admission of a consistent statement when a witness is "attacked on *another* ground" (emphasis added), the Rule necessarily restricts the admissibility of a statement when the witness is attacked on a ground specifically delineated in 801(d)(1)(B)(i): an accusation that the witness "recently fabricated" a story, or is "act[ing] from a recent improper influence or motive." *See* 801(d)(1)(B)(i). Here, it is impossible to separate the defendants' attack on the brothers' motivations from their charges of inconsistency, making

it difficult to hold that the brothers were attacked on "another ground." *See Magnan*, 756 F. App'x at 818–19; *see also United States v. Purcell*, --- F.3d ---, 2020 WL 4211555, at *27–28 (2d Cir. July 23, 2020) (affirming admission of statements under Rule 801(d)(1)(B)(ii) where the declarant was accused of making inconsistent statements *and* defense counsel never suggested "that the accuracy of [declarant's] trial testimony was marred by recent fabrication or a recently created improper motive or influence").

At least one circuit has noted that it is an open question whether the *Tome* rule applies to 801(d)(1)(B)(ii), though that court ultimately declined to hold that the district court had plainly erred in admitting the evidence under subsection ii. *See United States v. Davis*, 896 F.3d 784, 789 (7th Cir. 2018). The government identifies no cases in which our court or another court has admitted a prior consistent statement under similar circumstances. There are only a handful of circuit cases in which the admission of a prior consistent statement under 801(d)(1)(B)(ii) has been affirmed, but all involve distinct factual contexts. *See, e.g.*, *United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017) (admitting statement where declarant was repeatedly accused of "faulty memory"); *United States v. J.A.S., Jr.*, 862 F.3d 543, 545 (6th Cir. 2017) (admitting statement after declarant's credibility was attacked on "collateral grounds"). The government likewise cites no cases where a court concluded that a declarant was attacked on "another ground," even though it was undisputed that the declarant was primarily attacked on the basis of an improper motivation. *Cf. Purcell*, --- F.3d ----, 2020 WL 4211555, at *27–28. In light of the clear limitation in *Tome* and the defendants' consistent attempts to argue that the Romo brothers had a motivation to lie, we decline to hold that 801(d)(1)(B)(ii) permits such an end-run around the limitation in 801(d)(1)(B)(i). We therefore hold that the Romo brothers' statements were not admissible under 801(d)(1)(B)(ii).

In contrast to the Romo brothers' statements, the government identifies at least one portion of Portillo's cross examination of Merla where Portillo questioned Merla's memory of the events surrounding Robert Lara's killing. Portillo's counsel stated that "[e]vents were fresher on [Merla's] mind" closer to the murder, and suggested that this was a basis for inconsistencies in his testimony about whether Portillo gave the go-ahead to murder Lara. Portillo's attack on Merla's memory was sufficient to justify the admission of his prior consistent statement under Rule 801(d)(1)(B)(ii). *See Flores*, 945 F.3d at 705 (admitting prior consistent statements after a charge of faulty memory, even though the faulty memory accusations "were brief and were not [defendants'] main challenges" to the credibility of the witness). Because Merla was attacked on a ground other than his alleged motive to fabricate, the district court did not abuse its discretion in admitting this statement.

The government makes one final argument for the admissibility of the statements, asserting that all three statements were admissible under the common law rule of completeness. That rule, which has been "partially codified . . . in Rule 106" of the Federal Rule of Evidence, allows a party to introduce other portions of a written or recorded statement when the opposing side introduced only a portion of that statement. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988). The rule ensures that all parts of such a statement are "considered contemporaneously," *id.* at 172, and "guards against the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material," *United States v. Burns*, 162 F.3d 840, 853 (5th Cir. 1998) (internal quotation marks and citation omitted). The rule operates independently from Rule 801(d)(1)(B) and allows the admission of such statements even when they are

otherwise barred by the hearsay rules. *See United States v. Mohr*, 318 F.3d 613, 626 (4th Cir. 2003).

The government cites pages from the record where the defendants referred to specific portions of the statements that were later introduced at trial. But the government does not clearly explain why this questioning created a misleading impression about the *entirety* of the prior consistent statements. We have explained that the rule of completeness justifies admission of a statement only where it is "necessary to qualify, explain, or place into context the portion already introduced." *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996) (citation omitted); *see also United States v. Sanjar*, 876 F.3d 725, 739 (5th Cir. 2017) ("The rule comes into play . . . only when the additional inquiry is needed to 'explain, vary, or contradict' the testimony already given." (quoting *United States v. Pacquet*, 484 F.2d 208, 212 (5th Cir. 1973)). The government has not demonstrated that the statements admitted into evidence were necessary to correct any misleading impressions created by the defendants' references to the prior statements. *See United States v. Altvater*, 954 F.3d 45, 49–50 (1st Cir. 2020) (rejecting a rule of completeness argument where the proponent failed to meet his burden of showing that the full statement was necessary to correct a misimpression).[3]

We therefore hold that the district court abused its discretion in admitting the Romo brothers' prior consistent statements. This conclusion does

---

[3] The government makes the related argument that the prior consistent statements were admissible in order to "contextualize[], clarif[y], or amplif[y] the meaning of" the inconsistent testimony used by the defendants in their cross-examinations. *See United States v. Cotton*, 823 F.3d 430, 437 (8th Cir. 2016). Even if this argument justified the admission of some portion of the statements, the government does not explain why this rule justified the admission of the entirety of the brothers' confessions. However, the defendants' affirmative use of portions of the brothers' confessions and the government's avoidance of using the confessions in its direct examinations of the brothers collectively add to our conclusion that the district court's error was harmless.

not end our analysis, however. We must still affirm if the district court's error was harmless. *See, e.g.*, *United States v. Jones*, 664 F.3d 966, 974 (5th Cir. 2011). Here, the improperly admitted prior statements duplicated the Romo brothers' "lengthy, specific, and detailed accounts" of Portillo's and Pike's involvement in the two murders, which they repeated during trial. *Magnan*, 756 F. App'x at 819; *Akins*, 746 F.3d at 600. This stands in contrast to a situation like *Tome*, where the prior consistent statements were considerably more detailed and persuasive than the testimony introduced at trial—thus adding to their prejudicial impact. *Magnan*, 756 F. App'x at 819. In addition, the government introduced powerful circumstantial evidence to support the defendants' involvement in Benesh's murder, including evidence about each defendant's role within the organization and evidence about the aftermath of the murder and the defendants' reactions. *See, e.g.*, *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) ("Criminal conspiracies can be established on circumstantial evidence alone."); *cf. Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). This circumstantial evidence provided an additional basis to convict the defendants, even without the Romo brothers' testimony regarding the defendants' direct involvement in the murder. It is notable that the defendants do not point to reliance by the government on these statements in its principal or rebuttal closing arguments. Our own review of the closing arguments confirms that the government did not heavily rely upon the Romo brothers' confessions, making it difficult for us to conclude that the inadmissible evidence "permeate[d] the record." *United States v. Westmoreland*, 841 F.2d 572, 579 (5th Cir. 1988). To the contrary, the prior consistent statements were not themselves a crucial part of the government's case against the defendants. *See United States v. Whittington*, 269 F. App'x 388, 408 (5th Cir. 2008) (holding error harmless

where the improperly admitted evidence "was of minimal assistance" to the government).

Given the totality of the evidence, we are unable to conclude that "there is a reasonable probability that the improperly admitted evidence contributed to the conviction." *Sumlin*, 489 F.3d at 688. We therefore hold that the district court's error was harmless, and we affirm.

### iii. Criminal Convictions of Former Bandidos Leaders

The district court allowed several witnesses to testify about the conviction of George Wegers, who served as President of the Bandidos immediately before Pike. Wegers pleaded guilty to a RICO indictment in 2005. The court found this testimony relevant to the charges against both defendants because Weger's conviction occurred "during the period when the alleged conspiracy took place." However, the court simultaneously reminded the jury that "the defendants here are not responsible for Mr. Wegers's conduct and the fact that he may have pled guilty is not to be considered by you as evidence of the guilt of the defendants."

When Pike testified at trial, he repeatedly denied any knowledge of other Bandidos' criminal activities and argued that the Bandidos became a "family-oriented" club under his leadership. As a result, the court allowed the government to question Pike about his knowledge of other members' criminal convictions. The court again cautioned the jury that this testimony was not, "in any way, shape or form[,] . . . evidence against the defendants in this case." The court explained that the jury could only consider the evidence "as to the state of mind of Mr. Pike when he joined and maintained his membership in the Bandidos." After the close of evidence, the court reminded the jury that "[t]he defendants are not on trial for any act, conduct, or offense not alleged in the indictment." Pike and Portillo argue that this evidence was irrelevant and

that the probative value of this evidence was substantially outweighed by the risk of unfair prejudice.

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable . . . and . . . the fact is of consequence in determining the action." Federal Rule of Evidence 401. Rule 403 of the Federal Rules of Evidence allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." "In reviewing Rule 403 findings, we give great deference to the court's informed judgment and will reverse only after a clear showing of prejudicial abuse of discretion." *United States v. Peden*, 961 F.2d 517, 521 (5th Cir. 1992) (internal quotation marks and citation omitted).[4]

"[A] defendant's guilt may not be proven by showing that he associates with unsavory characters.'" *United States v. Romo*, 669 F.2d 285, 288 (5th Cir. 1982) (quoting *United States v. Singleterry*, 646 F.2d 1014, 1018 (5th Cir. Unit A 1981)). As a result, we have explained that evidence about a third party's criminal conviction—absent any evidence "connecting [that person] to [an] alleged conspiracy"—is "irrelevant to any issue in th[e] case," and is instead "a highly prejudicial attempt to taint defendant's character through 'guilt by association.'" *United States v. Labarbera*, 581 F.2d 107, 109 (5th Cir. 1978).

In the context of a conspiracy charge, however, evidence about a defendant's co-conspirators' actions is often highly relevant. *See, e.g., United States v. Ocampo-Vergara*, 857 F.3d 303, 307–08 (5th Cir. 2017). "[T]he agreement, a defendant's guilty knowledge and a defendant's participation in

---

[4] The government argues that Portillo did not contemporaneously object to all of the challenged testimony, and therefore his challenge should be reviewed for plain error only. In *United States v. Love*, 472 F.2d 490, 496 (5th Cir. 1973), however, we held that a defendant's failure to object is "excused" if his co-defendant objects, since an additional "motion or objection would have been a useless formality." We review both defendants' Rule 403 challenge for an abuse of discretion.

the conspiracy all may be inferred from the development and collation of circumstances," including evidence about the defendant's "presence and association with other members of a conspiracy." *Id.* (internal quotation marks and citations omitted). As a result, we have held that evidence about an associate's guilt is admissible as long as it has some tendency to establish the elements of a conspiracy against the defendant himself. *See, e.g.*, *United States v. Chavful*, 100 F. App'x 226, 231 (5th Cir. 2004) (admitting gang letter where it was "probative of [defendant's] association with other members of the conspiracy"); *United States v. Rodriguez*, 162 F.3d 135, 143 (1st Cir. 1998).

Here, the challenged evidence was relevant to the conspiracy charges against Portillo and Pike. Wegers was convicted of a RICO conspiracy based on his activities as the Bandidos President in 2005—the same time that Pike assumed the role of National President. The dates of the charged conspiracy in this case overlap with Wegers's conviction. As the government argues, the timing of Wegers's racketeering conviction—which occurred when Pike was National Vice President—undermines the defendants' argument that they were unaware that Bandidos members were engaged in criminal activity. *See United States v. Greenwood*, 974 F.2d 1449, 1459 (5th Cir. 1992) (dismissing defendants' guilt by association argument where the evidence supported the conclusion that the defendant was aware that the operation "he wished to join was an on-going criminal enterprise"). It also casts doubt upon their claim that the Bandidos was simply a family-friendly motorcycle club, not connected to violence or criminal activities. The evidence of other Bandidos' members convictions was also relevant to rebut Pike's defense, which rested on the argument that he was unaware of criminal activity committed by other Bandidos members. The Bandidos members whose criminal convictions were discussed at trial were involved in similar racketeering activity during the course of the defendants' involvement in the club, undermining Pike's claims

that the club was more "mainstream" during his Presidency and that the club itself existed simply for innocent entertainment purposes. *See, e.g.*, *Ocampo-Vergara*, 857 F.3d at 308 (explaining that no guilt by association problems arise if "the defendant's offense is connected to others' conduct"); *Chavful*, 100 F. App'x at 231 (observing that letter from non-defendant was relevant because it "served to rebut [defendant's] attempt to distance himself from the gang and the other members of the conspiracy"). Though evidence that can only be used to establish guilt by association is "improper and highly prejudicial," evidence that is relevant on its own terms is admissible if "reasonable inferences" regarding the defendants' guilt "could be drawn . . . by a reasonable juror." *United Sates v. Parada-Talamantes*, 32 F.3d 168, 169–70 (5th Cir. 1994).

The district court likewise did not abuse its discretion in declining to exclude this evidence under Rule 403. "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Pace*, 10 F.3d 1106, 1115–16 (5th Cir. 1993) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)). Here, the district court's repeated limiting instructions reminded jurors that evidence about non-defendants' criminal activity could not be used to prove the defendants' guilt. We have held that similar cautionary instructions can help to reduce the possibility of unfair prejudice. *See, e.g.*, *United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003) ("Under the Rule 403 standard, when the court issues a limiting instruction, it minimizes the danger of undue prejudice."). The court gave "extensive and immediate limiting instructions" and reiterated those instructions after the close of evidence. *United States v. Juarez*, 866 F.3d 622, 628–29 (5th Cir. 2017) (citation omitted). These instructions reminded the jurors that evidence about other Bandidos members did not prove the defendants' guilt and could instead only be used for "limited purposes." *United States v. Guerra*, 402 F. App'x 973,

976 (5th Cir. 2010). We therefore hold that the district court did not abuse its discretion in admitting this evidence.

### iv. *Goodfella's* Comment

During his testimony, Agent Schuster explained that his knowledge of the Bandidos was based on interviews with "patched-in" members and other "associate[s]" of the group, including "hang-arounds or support club members." On cross-examination, the defendants used this testimony to suggest that Schuster had only spoken to a handful of Bandidos members, rendering his opinions unreliable and unsupported. The government objected, arguing that the defendants' questions misstated Schuster's testimony regarding the basis for his knowledge.

The district court agreed and sustained the government's objection. The court explained that Schuster's testimony revealed that he had "two insider informants," but that he also spoke with a "bunch of hangers-on and other people who were . . . not in the club itself, but nonetheless were involved in the club." To help explain the role of non-member "hangers-on," the court analogized to the movie *Goodfellas*:

> Now, if I can use an example that maybe the jury might be familiar with and I'm not for a moment suggesting that the Bandidos are in any way, shape or form like this organization, but we all remember maybe the movie Goodfellas. Remember that movie? . . . [T]he main character in Goodfellas was Irish and there was another guy named Burke who was also Irish. Those people were not actually members of the mafia because you cannot become a member of the mafia unless you are Italian and you can trace your Italian lineage. They were Irish, but they worked with, for and were involved [] deeply in mafia activities, but they were not actually members of the mafia. So those people if we were trying that case wouldn't be members of the mafia, but they would be people who were associated with them, okay. . . . I used that example because it's a very easy one to draw, not because I'm suggesting that the people who were involved with the Bandidos were like the two people who were involved in the movie.

44

Neither of the defendants objected to the district court's explanation.

Portillo argues that the district court's comment was unfairly prejudicial. Because he failed to object to this comment during trial, we review his challenge for plain error only. *United States v. Williams*, 620 F.3d 483, 488–89 (5th Cir. 2010).

"A district judge in a jury trial is 'governor of the trial for purposes of assuring its proper conduct and of determining questions of law.'" *Johnson v. Helmerich & Payne, Inc.*, 892 F.2d 422, 425 (5th Cir. 1990) (quoting *Quercia v. United States*, 289 U.S. 466, 469 (1933)). As a result, judges have both "the right and the duty to comment on the evidence to ensure a fair trial." *Id.* Because judges have "enormous influence on the jury," however, they "must act with a corresponding responsibility" when making comments or questioning witnesses. *United States v. Williams*, 809 F.2d 1072, 1086 (5th Cir. 1987); *see also United States v. Middlebrooks*, 618 F.2d 273, 277 (5th Cir. 1980) ("It is well known that juries are highly sensitive to every utterance by the trial judge." (cleaned up)).

We do not agree that the district court committed plain error when it made the *Goodfellas* statement. This stray statement was unnecessary. However, the court was careful to provide the jury with limiting instructions. The district judge explained that he was not suggesting that there was any resemblance between the Bandidos and the mafia, reducing the risk that the jury would have interpreted the judge as demonstrating a bias towards the government. The court was also careful to explain at the close of evidence that the jury should "disregard anything [the court] may have said during the trial in arriving at your own verdict." We have held that the prejudicial impact of a district court's comments may be "adequately cured by the trial court's instructions to the jury . . . to ignore his comments and to be the sole judge of

the facts." *Johnson*, 892 F.2d at 426. In *United States v. Bermea*, 30 F.3d 1539, 1571–72 (5th Cir. 1994), we approved nearly identical curative instructions, holding that "a curative instruction such as this one can operate against a finding of . . . error."

Even if the statement was clear and obvious error, Portillo fails to explain how it affected his substantial rights. When determining whether a prejudicial court comment impacted the jury's verdict, it is necessary to review those actions in the context of "the entire trial record." *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 579 (5th Cir. 2001) (citation omitted). Here, the court's comment takes up just a page of the transcript in a three-month-long trial. The relative insignificance of this one stray comment demonstrates that any error "did not deprive the defendants of their rights to a fair trial." *Williams*, 809 F.2d at 1090.

### v. Access to Psychiatric Records

Magenta Winans testified on behalf of the government about Robert Lara's murder. On direct examination, Winans also testified about her own drug use and her mental health history. She explained that she had been diagnosed with "PTSD, bipolar disorder two, anxiety, depression, ADHD, and dyslexia," and she testified that she "lost a lot of . . . memory" and "really forgot all about everything" after her son died.

During cross-examination, Winans was asked to provide more detail about her psychiatric treatment and medications. She told the jury that she was on several medications that help "keep [her] calm" and "help [her] so [she] can sleep and . . . keep the rage off." At one point, she was taking as many as eight medications a day. She sees a doctor once or twice a month and had been seeing the same doctor since 2014. When the court asked if the medications ever "affect[ed] [her] ability to think or reason," she replied affirmatively,

stating that they impact her thinking abilities and that she "couldn't really drive" while she was on the medications.

Before Winans was subjected to cross examination, Portillo moved for production of her psychiatric, psychological, and counseling records. With support of counsel, Winans opposed the disclosure of the material. The court ordered the records produced to a magistrate judge for *in camera* review. After reviewing the records, the magistrate judge held that the records were protected by the psychotherapist-patient privilege and denied Portillo's motion.

"We review factual findings underlying a ruling of psychotherapist-patient privilege for clear error, and we review application of the legal principles *de novo*." *United States v. Murra*, 879 F.3d 669, 680 (5th Cir. 2018) (citing *United States v. Auster*, 517 F.3d 312, 315 (5th Cir. 2008)). "A district court's factual finding is clearly erroneous 'if, on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011)).

The psychotherapist-patient privilege was first identified by the Supreme Court in *Jaffee v. Redmond*, 518 U.S. 1 (1996). In that case, the Court held that the privilege "promotes sufficiently important interests to outweigh the need for probative evidence." *Id.* at 9–10 (cleaned up). To obtain the benefits of the privilege, the communication must be confidential, between a licensed psychotherapist and her patient, and conducted "in the course of diagnosis or treatment." *Id.* at 15. Portillo makes two arguments to challenge the court's conclusion that the documents were privileged: (1) Winans waived the privilege when she disclosed her "mental health treatment, diagnoses and medications during her testimony," and (2) as a criminal defendant, his constitutional rights to confrontation and due process override the privilege.

47

No. 18-50793

Neither of these arguments demonstrates that the court erred when it denied Portillo's motion to access the records.

First, Winans did not waive the privilege simply by testifying about her psychiatric conditions and medication history. The privilege protects confidential *communications* between a psychotherapist and a patient. Winans testified about the *facts* of her medical diagnoses and medication history, but she did not provide any details about the nature of her conversations with her doctor. In *Murra*, we explained that a witness does not waive the privilege merely by disclosing "facts" to "third parties and at trial." 879 F.3d at 680. Winans had a "reasonable expectation of confidentiality" in her confidential communications with her psychotherapist, and her disclosure of the fact of that relationship—as well as the nature of her medication regimen—does not demonstrate that "any portion of those confidential communications was revealed . . . to any third party." *Id.* at 681 (citation omitted).

Our own independent review of Winans's psychiatric records confirms that Winans did not reveal confidential information at trial. Winans's records detail confidential discussions with her doctor about her treatment and condition. Even though Winans's current medication regimen falls outside of the privilege, her forthcoming testimony about these details demonstrates that there was "no relevant underlying fact discussed in [her] psychotherapy sessions that was not fully explored during [her] testimony and cross-examination at trial." *Id.* at 680–81. She did not "attempt[] to hide behind the privilege to avoid giving testimony about those facts," *id.* at 681, and there was therefore no basis to conclude that she waived the privilege or that disclosure was necessary to reveal facts that are not subject to the privilege. *See also id.* ("[The defendant] cannot be permitted . . . to review confidential communications and *then* advise the court of the harm she suffered as a result of the withholding.").

48

Similarly, we do not believe that Portillo's constitutional rights were violated by the court's failure to disclose these records. With respect to Portillo's claim under the Confrontation Clause, there is no basis to conclude that Portillo's ability to cross-examine Winans was hampered by the denial of his motion. Portillo's counsel was permitted to ask Winans detailed questions about her psychiatric treatment and medication regimen on cross-examination, distinguishing this case from *Davis v. Alaska*, 415 U.S. 308 (1974); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53 (1987) (plurality) (explaining that the Confrontation Clause is not "a constitutionally compelled rule of pretrial discovery," but instead merely ensures the right of a defendant to question an adverse witness). Likewise, Portillo's *Brady* claim fails because he has not demonstrated that the "prosecution team had access" to Winans's records—a necessary prerequisite for the claim to succeed. *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005).

We therefore hold that the district court did not abuse its discretion in denying Portillo access to Winans's psychiatric records.

### vi. Sonny Barger's Prior Convictions

When Barger testified on behalf of the defense, he explained that the Hell's Angels and the Bandidos had peacefully co-existed for decades. He denied that the clubs were enemies, and he claimed that the Hell's Angels was simply a "fun-loving motorcycle club," not a group predisposed to violence. Over Pike's objections, the district court allowed the prosecution to impeach Barger with two prior convictions: (1) felony drug trafficking in 1973, and (2) conspiracy to transport and receive explosives with the intent to kill and

damage buildings in 1989. The defendants argue that the district court abused its discretion when it admitted these convictions.[5]

"Extrinsic evidence, which includes prior convictions, is admissible under the general standards of Rules 402 and 403 to contradict specific testimony, as long as the evidence is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Lopez*, 979 F.2d 1024, 1034 (5th Cir. 1992); *see also United States v. Moon*, 802 F.3d 135, 146 (5th Cir. 2015) ("Although [the defendant] invokes Rule 609 in asserting that the evidence surrounding his 2001 robbery conviction was improperly admitted, that rule is beside the point where, as here, the challenged evidence was offered to contradict the specific testimony.").

In several cases, we have affirmed the admissibility of a prior conviction where the witness's testimony either explicitly denied the conviction or created a misleading impression that could only be corrected through admission of the conviction. In *United States v. Carter*, 953 F.2d 1449 (5th Cir. 1992), we held that a prior misdemeanor conviction was admissible to contradict the witness's statement that he was continuously employed during the period of time when he was actually incarcerated. *Id.* at 1456, 1458. Likewise, in *Lopez*, we affirmed the admission of evidence about a prior marijuana conviction when it was used to contradict the witness's testimony that he "never had seen and did not recognize" the drug. 979 F.2d at 1034.

The government argues that Barger's convictions were admissible to contradict Barger's testimony that the Hell's Angels was simply a "fun-loving

---

[5] Pike preserved this error when he objected during trial. Though Portillo did not discuss this issue in his brief, he adopted Pike's argument in his own brief. Federal Rule of Appellate Procedure 28(i) permits this practice as long as the issue does not raise "fact-specific challenges to [a defendant's] own conviction or sentence." *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996). The defendants' challenge to the admission of Barger's convictions is not fact-specific or individual to either defendant.

motorcycle club." Barger's 1989 conspiracy conviction was related to a "plot to kill members of the Outlaw motorcycle club in Louisville, Kentucky," suggesting that the Hell's Angels participated in violent retaliatory attacks—not simply "fun-loving" entertainment. Likewise, Barger's drug conviction cast doubt upon his innocent characterization of the Hell's Angels, suggesting that the club and its members were involved in drug trafficking.

Even if the contradictions between Barger's testimony and his prior convictions are not as direct as the contradictions in *Lopez* and *Carter*, any error in admitting these convictions was harmless. Barger's testimony was relatively brief, and it did little to challenge the elements of the charges against the defendants. The government presented substantial evidence to dispute Barger's claim about the relationship between the Hell's Angels and the Bandidos and to establish the defendants' responsibility for Benesh's murder. *See United States v. Simmons*, 374 F.3d 313, 321 (5th Cir. 2004) (holding error harmless where there was "overwhelming direct and circumstantial evidence" of the defendant's guilt). Because Barger's testimony played such a minor role in the trial as a whole, the defendants are unable to show that "there is a reasonable probability that the improperly admitted evidence contributed to the[ir] conviction[s]." *Sumlin*, 489 F.3d at 688.

### vii. Portillo's Prior Statement

During Pike's case-in-chief, he moved to admit a letter that Portillo had written him ten months after the two defendants were indicted. In the letter, Portillo wrote that he was "truly sorry about this mess." He told Pike "[t]his is bullshit," and "I plan to fight this to the end + take what I got coming." He also told Pike "You had nothing to do with it. You or I cannot control what people do 24-7. I hope to see you soon + not in a courtroom."

The district court held that the letter was inadmissible. First, it was inadmissible under Rule 806 to impeach Portillo's recorded conversations

because Portillo had never made any statements implicating Pike that would have been inconsistent with the letter. The court also found that Pike was trying to introduce the letter as substantive evidence, rather than impeachment evidence. And because Portillo's statement that Pike "had nothing to do with it" was vague, the court found the letter "nebulous at best." The court also held that the letter should be excluded under Rule 403 because it had "very little probative value given its obliqueness" but could "be extremely damaging to Mr. Portillo if the Government is then able to argue that Mr. Portillo . . . has basically admitted the entire case."[6]

Federal Rule of Evidence 806 allows a party to attack the credibility of a declarant whose hearsay statement has been admitted into evidence. Under the rule, the party can impeach the hearsay declarant "by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. "The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." *Id.*; *see also United States v. Moody*, 903 F.2d 321, 328 (5th Cir. 1990); *United States v. Graham*, 858 F.2d 986, 990 (5th Cir. 1988).

In order to determine whether a statement is admissible under Rule 806, the court must "first decide whether the proffered statement is actually inconsistent with the hearsay statement already admitted." *Graham*, 858 F.2d at 990; *see also United States v. Hale*, 422 U.S. 171, 176 (1975) ("As a preliminary matter . . . the court must be persuaded that the statements are indeed inconsistent."). As the Supreme Court stated in *Hale,* "the question whether evidence is sufficiently inconsistent to be sent to the jury on the issue

---

[6] For the purposes of reaching a decision, the court assumed that Pike would be able to establish that the letter was in fact written and signed by Portillo.

of credibility is ordinarily in the discretion of the trial court." 422 U.S. at 180 n.7.

Pike argues that Portillo's letter was admissible as impeachment evidence under Rule 806 because it was inconsistent with statements made by Portillo in a set of recorded phone conversations introduced at trial. Pike points to a number of comments made by Portillo during the course of these recordings: (1) "I was talking to the general manager, he said play ball. Said batter up motherfucker;" (2) "I asked the guy in Houston to turn his back from what I'm gonna do;" (3) "His word is final;" and (4) "I don't make no majors without him knowing about it." Pike argues that these statements suggested Pike was involved in specific decisions made by Portillo and by the Bandidos; by contrast, he argues that Portillo's letter, which stated that Pike "had nothing to do with it," was inconsistent with these comments because it demonstrated Pike's lack of knowledge about the Bandidos' crimes.

The district court did not abuse its discretion when it held that Portillo's letter was not inconsistent with any of these statements. Portillo's recorded conversations suggest that Pike, as the President of the Bandidos, was aware of some of the Bandidos' criminal activities. But these specific comments are not necessarily inconsistent with the vague and "nebulous" comments in Portillo's jailhouse letter. As the district court found, it is unclear from the letter what "it" meant. Given this uncertainty, it is not inconsistent for Portillo to have acknowledged Pike's knowledge about Portillo's major decisions, while also stating that Pike was not affiliated with other specific and discrete crimes. Even if it might have been within the district court's discretion to find that the statements here were inconsistent, that does not necessarily mean that the court's contrary conclusion was erroneous. *See, e.g.*, *Gonzalez v. Fresenius Med. Care N.A.*, 689 F.3d 470, 480 (5th Cir. 2012).

For similar reasons, the district court did not abuse its discretion when it held, in the alternative, that the evidence was inadmissible under Rule 403. Given the inconclusive nature of the inconsistency, the probative value of the letter was minimal, especially when set against the high risk of prejudice. *See United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015) ("A district court's ruling regarding Rule 403 is reviewed with an especially high level of deference to the district court, with reversal called for only rarely and only when there has been a clear abuse of discretion." (cleaned up)). As a result, we affirm the district court's decision to deny admission of Portillo's letter.

### E. Duplicative Special Assessments

The district court imposed a special assessment of $100 on each of Portillo's thirteen crimes of conviction. Portillo argues that the district court's imposition of duplicative special assessments violates the Double Jeopardy Clause. Because he did not object to his sentence on this basis before the district court, we review his challenge for plain error only. *See United States v. Danhach*, 815 F.3d 228, 238 (5th Cir. 2016).

The imposition of multiple special assessments on concurrent counts of conviction can violate the constitutional prohibition against imposing "multiple punishments for the same act." *United States v. Kimbrough*, 69 F.3d 723, 729 (5th Cir. 1995) ("[F]or double jeopardy purposes, sentences are not truly concurrent where a mandatory special assessment is separately imposed on each conviction."). However, *Kimbrough* makes clear that separate special assessments violate the double jeopardy clause only if the assessments were imposed for the *same* criminal act. *See, e.g., Whalen v. United States*, 445 U.S. 684, 688 (1980). There is no double jeopardy problem if the special assessments were imposed for "distinct criminal acts." *Danhach*, 815 F.3d at 239.

Portillo was sentenced to concurrent sentences on counts 1, 4, 5, 6, 7, 10, 11, 12, and 13. Those counts charged him with: a racketeering conspiracy,

conspiracy to commit murder in aid of racketeering, conspiracy to commit an assault with a deadly weapon in aid of racketeering, assault with a dangerous weapon in aid of racketeering in Palo Pinto, assault with a dangerous weapon in aid of racketeering in Port Aransas, conspiracy to distribute and possession with intent to distribute a controlled substance, possession with intent to distribute cocaine, conspiracy to interfere with commerce by threats or violence, and possession of a firearm as a felon. These crimes all involve distinct offenses and required the jury to find distinct elements to convict. Portillo fails to argue how those offenses "should be considered to constitute the same offense." *Lopez*, 426 F. App'x at 264. He has therefore failed to establish plain error, and we affirm.[7]

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[7] The defendants also argue that the cumulative error doctrine requires reversal of their convictions. Though we agree that the district court's admission of the Romo brothers' prior consistent statements was erroneous, this single harmless error does not require reversal. *See United States v. Ceballos*, 789 F.3d 607, 621 (5th Cir. 2015) (holding that reversal is required only when otherwise harmless "errors so fatally infected the trial that they violated the trial's fundamental fairness" (cleaned up)); *United States v. Delgado*, 672 F.3d at 343–44.