Filed 6/14/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B305783 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA089473) |
| v. | |
| JOE LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Joe Lopez appeals from a judgment entered after a jury convicted him of murder (Pen. Code, § 187, subd. (a)) and gross vehicular manslaughter while intoxicated (*Id.*, § 191.5, subd. (a)). Lopez's principal contention on appeal is that the trial court violated his constitutional rights by refusing to provide to counsel during voir dire the names of prospective jurors, instead referring to them only by their badge numbers. Lopez also contends the trial court abused its discretion in denying his request to exclude his admission in a jail call with his sister that he had killed someone.

It is a generally accepted practice for trial courts to refer to jurors by their juror badge numbers during voir dire to protect the jurors' privacy. Courts must be careful in utilizing this practice to make clear to jurors there is a reason for the procedure other than possible safety concerns relating to the defendant. The trial court in this case adopted a general practice of not only identifying prospective jurors by their badge numbers, but also withholding from the attorneys the jurors' names out of a concern the attorneys (or a member of the public or press) would obtain additional information about the jurors on the Internet or contact the jurors. In the absence of a compelling need specific to the case to conceal from the attorneys the names of prospective jurors, this was an abuse of discretion. The trial court also erred in advising prospective jurors that the court was referring to them by numbers in part for security reasons, because jurors could speculate that Lopez posed a security risk. Although the trial court abused its discretion in concealing the names of prospective jurors, on the record here the error was harmless. In addition, the trial court did not abuse its discretion in denying defendant's motion to exclude his admission. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Evidence at Trial*

1.  *The prosecution case*

Late at night on August 12, 2017 Sam Edinburgh drove his Toyota Corolla from a performance he attended toward his home in Palmdale.  At about 12:45 the following morning he called his daughter to tell her he was pulling over to the side of the freeway to take a nap.

Sometime between 5:10 and 5:20 a.m., Norma Hernandez was driving northbound on Route 14 near the Soledad Canyon exit when she saw a car crash into the back of a car that was parked on the right-hand lane or edge of the shoulder.  The moving car appeared to be travelling at about 60 to 65 miles per hour, the same speed Hernandez was driving.  Hernandez saw car parts from the collision going "everywhere," so she stopped on the freeway and called 911.

Around the same time, Michael Esplana was driving northbound on Route 14 when he saw a car in the middle of the northbound lanes that was "slowly catching on fire."  Esplana pulled over to the left side of the freeway adjacent to the concrete divider and called 911.  Esplana exited his vehicle and approached the burning car.  Flames emanated from the rear bumper, then enveloped the entire car.  Esplana observed a white car on the right side of the road against the guard rail.

California Highway Patrol Officer Manuel Ramos and his partner responded to the scene.  By the time they arrived, a firetruck was there.  Officer Ramos observed a car fully engulfed in flames in the middle of the freeway, and a white Toyota Matrix on the right side of the road.  Lopez was standing next to the Toyota Matrix.  Officer Ramos spoke with Lopez, who smelled of

3

alcohol. Lopez stated he was the driver of the white car, which his uncle had loaned him, and he confirmed he was in a collision.

Lopez told Officer Ramos that the other vehicle had "literally stopped in the middle [of the freeway] from nowhere," and Lopez "hit it." Lopez stated he was going more than 60 or 65 miles per hour, but no more than 70. Officer Ramos suggested to Lopez he must have been going at least 90 miles per hour because otherwise he would have had time to see the other car, to which Lopez responded, "No, sir. I was not going 90 miles an hour."

California Highway Patrol Officer Omar Sanchez also responded to the scene and spoke with Lopez.[1] Lopez had "red and watery eyes" and a strong odor of an alcoholic beverage. Officer Sanchez asked Lopez whether he was driving the Toyota Matrix, and Lopez responded, "Yes, absolutely." Lopez said he was driving about 70 miles per hour in the far right lane when he saw a "blunt object" appear on the road. Lopez had last consumed one 12-ounce beer the prior day at noon. Officer Sanchez administered several field sobriety tests to Lopez, which Lopez did not perform satisfactorily. Officer Sanchez also had Lopez blow two times into a preliminary alcohol screening (PAS) device, at 6:56 and 6:59 a.m. Each time Lopez's blood alcohol concentration was recorded at approximately .15 percent. Officer Sanchez opined based on Lopez's objective symptoms and the results of the field sobriety and PAS tests that Lopez had driven his car under the influence of alcohol and he could not operate his

---

[1]     Officers Ramos's and Sanchez's interviews of Lopez were recorded by the "dash cam" mounted on the officers' patrol cars. The video and audio recordings from the dash cams were played for the jury.

vehicle with the caution that a sober person would characteristically exercise.  Further, Lopez had made an unsafe turn in violation of Vehicle Code section 22107[2] by driving onto the shoulder, which caused the collision.

Following Lopez's arrest, his blood was taken by a nurse at the hospital at 8:00 a.m.  Two separate tests of the blood sample showed Lopez had blood alcohol concentrations of .15 and .17 percent.  Los Angeles County Sheriff's Department senior criminalist Isaac Cheney opined that a male weighing 150 pounds with a blood alcohol concentration of .15 to .17 percent would have had 4.8 to 5.5 standard drinks in his system at the time of the test.  Cheney opined that at blood alcohol levels of .08 and above, "all people are impaired and unsafe to operate a motor vehicle safely."

California Highway Patrol Officer Chad Smithson, who observed and documented the accident scene following the collision, opined the Toyota Corolla was parked on the right shoulder, and Lopez's car "while traveling on the right shoulder hit it at a high rate of speed, at a direct impact to the rear." Upon impact, the Toyota Corolla collided with the guardrail and spun out, travelling backwards into the middle two lanes of the roadway.  Lopez's car travelled along the right shoulder and came to rest against the guardrail.

---

[2]     Vehicle Code section 22107 provides, "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

5

On the day of his arrest, Lopez called his sister Sarah Lopez (Sarah) from jail. The recording of the call was played for the jury. Lopez stated he had been charged with a felony and asked Sarah to post bail for his release. He stated he could pay the bail if he was able to return to work. Lopez added, "If not, they're going to throw me in jail . . . . I killed somebody." Sarah asked, "Did they die?" Lopez responded, "Yes."[3]

2.      *The defense case*

Kurt Weiss, a collision reconstruction specialist, viewed the accident site and reviewed the evidence gathered by the California Highway Patrol officers. Weiss explained there was a "gentle" curve in the freeway before the accident site, and as drivers approach the area, a hillside on the left blocks the view until the driver rounds the corner, interfering with the driver's ability to see objects in the distance. Weiss estimated a driver approaching the accident site could see approximately three-quarters of a mile ahead. Weiss acknowledged on cross-examination the turn "doesn't seem overly dangerous to

---

[3]      The People also presented testimony from a police officer describing an April 14, 2015 incident in which Lopez was pulled over for speeding, did not perform satisfactorily on the field sobriety tests, and blew into the PAS device two times, recording blood alcohol levels at approximately .18 percent. Lopez later pleaded no contest to misdemeanor driving under the influence. As part of the sentence, Lopez completed a six-month alcohol education program for people convicted of driving under the influence of alcohol. According to the director of the program, all students were advised at least three times that driving under the influence of alcohol is dangerous, and if they drove under the influence and killed someone, they could be charged with murder.

negotiate," and the collision was caused by driver error by the operator of the Toyota Matrix.

B. *The Verdict and Sentence*

The jury found Lopez guilty on count 1 of murder and on count 2 of gross vehicular manslaughter while intoxicated. The trial court sentenced Lopez to 15 years to life in state prison on count 1 and imposed and stayed the middle term of six years on count 2 pursuant to Penal Code section 654.

Lopez timely appealed.

## DISCUSSION

A. *The Trial Court Abused Its Discretion in Concealing the Names of Prospective Jurors from Counsel, but the Error Was Harmless*

1. *Proceedings below*

On the first day of trial, before the prospective jurors were brought into the courtroom, the trial court provided counsel with a random list of 63 jurors. In response to defense counsel's comment that there were no names on the list, the court stated, "You are not going to get the names . . . . [¶] . . . [¶] . . . You just get [a] random list without names." Defense counsel commented, "This is the first time I have had a list without any names on it." The court replied, "I don't give out names because I have had attorneys googling, making improper contact with jurors . . . . [¶] . . . [¶] . . . [M]ost of my colleagues in the building do not give out the names."[4] Defense counsel stated, "Usually we have names. We give back the list every day. We are not supposed to take the

---

[4]    The trial took place in the San Fernando courthouse.

7

list home. We usually have a list of the names so we have an idea of the ethnicity of the jurors, have an idea where they come from." The court stated, "You are going to get information from the process, you will get their information, area of residence, everything else, like I said. And I'm not alone. Most of my colleagues do not give out the names. If you do felonies, the names are not given out." The court explained its practice of concealing the names of jurors started in 2008 or 2009 when defense counsel in a case was sitting at counsel table researching jurors on the Internet. The court later added, "The reason I do not give out names, this is a murder case. Defendant is facing life charges. Again, I have had problems in the past. Also, we have family members here, and I have had people that have been contacted on [social media] and through other means."

The next day Lopez's attorney requested to address the trial court about its decision to have an anonymous jury. The court responded that it had made a decision, but it allowed Lopez's attorney to make a record. Lopez's attorney discussed the factors set forth in *United States v. Shryock* (9th Cir. 2003) 342 F.3d 948, 971 (*Shryock*) for having an anonymous jury and argued the only applicable factor was that defendant faced a life sentence. Lopez's attorney asked the court to specify the reasons why an anonymous jury was necessary. The court explained it had spoken with two colleagues in the courthouse who did not give out the names of jurors in murder cases. Further, "in light of the social media, it is very easy to find jurors, to contact jurors, to discuss with jurors or find out their background and history, which is not appropriate because that's an ex-parte communication . . . . [¶] . . . And it is my policy not to release the names because, again, being able to identify them by ethnicity or background is not an appropriate challenge for cause nor is it

appropriate for any reason to excuse a juror based on their surname or their names."

The court continued, "I also ask any of the jurors: Do you recognize any of us before you? Have you ever talked to any of us, or do you have any information? They will then say, when they are brought to the jury box, oh I know [defense counsel]. . . . [¶] . . . The names will not be revealed. The court finds good cause. The defendant is looking at a life crime. We have people in the audience that are attending. There was somebody [from] the newspaper here just the other day . . . taking notes in the courtroom."

After the first group of prospective jurors was brought into the courtroom, the court read the charges and introduced Lopez, the attorneys, and court staff. The court also read a list of potential witnesses and asked the jurors whether they knew any of them. The court advised the jurors that they would be referred to by the last four digits of their badge numbers, explaining, "[W]e don't mean any disrespect, this is to protect your privacy and your security. And that's also why we have you wear the badges . . . throughout the building." The court explained the importance of jury duty and that it would be too expensive to employ professional jurors. The court added that with professional jurors there would be a "greater chance of graft or corruption because everybody will know who these jurors are." The court made similar introductory remarks when the second group of prospective jurors was bought into the courtroom.

The court asked the prospective jurors to complete a questionnaire stating whether the juror (1) drives a motor vehicle; (2) consumes alcoholic beverages; (3) has been arrested or convicted of driving under the influence; (4) has been the victim of a suspected drunk driver; (5) has ever witnessed a person the

9

juror suspected to be driving under the influence; (6) has ever witnessed a vehicle crash that the juror suspected was caused by a person driving under the influence; and (7) belonged to a group or organization that advocates a change in the laws concerning the consumption of alcoholic beverages or driving under the influence.[5]  Once in the courtroom, the prospective jurors stated their area of residence; marital status; occupation; occupation of spouse or significant other; number of adult children (and the children's residence area and occupation); prior jury experience; and whether the juror or someone close to the juror was an attorney, in law enforcement, convicted of a crime, or a victim of a crime.

 2. *Governing law*

Code of Civil Procedure section 237, subdivision (a)(2),[6] provides, "Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, . . . consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section."  Section 237, subdivision (b), provides that any person may petition for access to juror records by filing a petition "supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's

---

[5]  The court asked the jurors also to respond to the drunk driving questions with respect to people close to the jurors.

[6]  Further undesignated statutory references are to the Code of Civil Procedure.

personal identifying information."[7]  Subdivision (b) provides further that the court shall set the matter for a hearing upon the filing of a petition and supporting declaration establishing "a prima facie showing of good cause for the release of the personal juror identifying information," unless "there is a showing on the record of facts that establish a compelling interest against disclosure.  A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm." (§ 237, subd. (b).)

The requirement that juror identifying information be sealed upon recording the verdict was part of a 1995 amendment to section 237 intended "to protect jurors from dangerous, threatening, or harassing investigations."  (Assem. Com. on Public Safety, 3d reading analysis of Sen. Bill No. 508 (1995-1996 Reg. Sess.) June 6, 1995, p. 3; see *Erickson v. Superior Court* (1997) 55 Cal.App.4th 755, 758, fn. 2 (*Erickson*).)  As the *Erickson* court observed, the Attorney General in sponsoring the bill stated the amendment was "'necessary because there have been incidents when a defendant has received information about the jurors and has harassed or threatened them, by mail, from prison.'"  (*Erickson*, at p. 758, fn. 2, quoting Assem. Com. on Public Safety analysis of Sen. Bill No. 508, p. 3.)

Section 237 "does not authorize sealing of juror identifying information at any stage of a civil action or at any stage of a

---

[7]     Section 206, subdivision (g), similarly provides that following the recording of the jury verdict in a criminal trial, a defendant or defendant's counsel may petition the court for access to personal juror identifying information, including the jurors' names, addresses, and telephone numbers "for the purpose of developing a motion for new trial or any other lawful purpose."

criminal action prior to return of [the] jury verdict." (*Erickson, supra*, 55 Cal.App.4th at p. 758; see *id.* at p. 759 [court policy mandating sealing of juror identifying information prior to return of jury verdict, thereby preventing parties, counsel, and others from having access to the information absent the filing of a petition, conflicted with section 237 and was "invalid and unenforceable"]; *People v. Phillips* (1997) 56 Cal.App.4th 1307, 1309-1310 [section 237's "postverdict provision cannot be used to justify the court's action during voir dire"].) However, the Court of Appeal in *Phillips* applied the standard for sealing juror information postverdict in reviewing the trial court's decision to keep the information confidential during voir dire. (*Phillips*, at pp. 1309-1310.) As the court explained, "The [trial] court in this case made no determination that there was a compelling interest which required identifying information of qualified jurors be kept confidential. In the absence of that determination, it was improper for the court to keep this information from the public, or the parties." (*Ibid.*)

The Court of Appeal in *People v. Goodwin* (1997) 59 Cal.App.4th 1084, 1087 addressed the general practice of identifying prospective jurors by assigned numbers instead of their names. The court concluded the practice did not violate the defendant's right to a public trial under the Sixth and Fourteenth Amendments to the United States Constitution because the trial was open to the public, with the jurors' faces visible to those in the courtroom. (*Goodwin*, at pp. 1092-1093.) In reaching this conclusion, the court emphasized that the jury was not anonymous in that the court and counsel had a document with juror identifying information. (*Id.* at p. 1092.)

The Supreme Court in *People v. Thomas* (2012) 53 Cal.4th 771, 787-788 (*Thomas*) revisited the question raised in *Goodwin*

12

whether trial courts could properly identify jurors by numbers instead of names. In *Thomas*, as in *Goodwin*, the trial court provided counsel with the jurors' names.[8] (*Thomas,* at p. 787.) The Supreme Court concluded the trial court did not abuse its discretion in utilizing the procedure of identifying jurors by numbers because the prosecutor had informed the court that two witnesses had been threatened and one had been offered a bribe, and the trial court explained to prospective jurors that numbers were being used to protect their privacy in light of media interest in the case, thus minimizing any prejudice to the defendant.[9] (*Id.* at p. 788.) In reaching this conclusion, the court applied federal law on the factors relevant to whether a court abuses its

---

[8] The Supreme Court in *Thomas, supra*, 53 Cal.4th at page 788 emphasized that because counsel had the names of the jurors, "the jurors were not completely anonymous." Most courts have used the term "anonymous jury," as do we, to describe a jury where the members are identified by numbers instead of names and neither the public nor the attorneys are provided the names of the jurors. (See, e.g., *Erickson, supra*, 55 Cal.App.4th at pp. 757, 758, fn. 2 ; *United States v. Harris* (7th Cir. 2014) 763 F.3d 881, 886 [distinguishing between an anonymous jury where the jurors' names are withheld from the attorneys and a "confidential jury" where the attorneys are given the jurors' names but the public is not].)

[9] The *Thomas* court declined to decide whether the Court of Appeal in *People v. Goodwin, supra*, 59 Cal.App.4th at page 1089, had correctly found the procedure of identifying jurors by numbers for administrative convenience was proper, even absent a showing of a particular need to protect jurors' identities. (*Thomas, supra*, 53 Cal.4th at p. 787.)

discretion in employing an anonymous jury. (*Id*. at pp. 787-788.)[10]

The *Thomas* court explained that federal courts "recognize two potential problems with an anonymous jury: (1) jurors may infer that the defendant is dangerous, thereby implicating the defendant's right to a presumption of innocence, and (2) the use of an anonymous jury may interfere with the defendant's ability to conduct voir dire and exercise peremptory challenges." (*Thomas, supra*, 53 Cal.4th at p. 787-788, citing *Shryock, supra*, 342 F.3d at p. 971.) Thus, federal cases have allowed the empanelment of an anonymous jury only "'where (1) there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused.'" (*Thomas*, at p. 788, quoting *United States*

---

[10] "While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight. [Citation.] Where lower federal precedents are divided or lacking, state courts must necessarily make an independent determination of federal law [citation], but where the decisions of the lower federal courts on a federal question are 'both numerous and consistent,' we should hesitate to reject their authority." (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320, disapproved on another ground in *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 436, fn. 5, 442; accord, *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58; see *People v. Brooks* (2017) 3 Cal.5th 1, 90 ["We are not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight."].) As we will discuss, federal decisions on the use of anonymous juries are both numerous and consistent.

*v. DeLuca* (1st Cir. 1998) 137 F.3d 24, 31 (*DeLuca*); see *United States v. Portillo* (5th Cir. 2020) 969 F.3d 144, 162 (*Portillo*) ["Empaneling an anonymous jury 'is a drastic measure[] which should be undertaken only in limited and carefully delineated circumstances.'"]; *United States v. Mikhel* (9th Cir. 2018) 889 F.3d 1003, 1031 [applying *Shryock* factors for empanelment of anonymous jury]; *U.S. v. Ramirez-Rivera* (1st Cir. 2015) 800 F.3d 1, 35 ["'empanelment of an anonymous jury should be recognized as an extraordinary protective device, especially if it tends to suggest that the jurors may have something to fear from the accused, thereby conceivably encroaching upon the presumption of innocence'"]; *United States v. Dinkins* (4th Cir. 2012) 691 F.3d 358, 372 (*Dinkins*) ["An anonymous jury is warranted only when there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised if the jury does not remain anonymous."].)

As the Ninth Circuit explained in *Shryock, supra,* 342 F.3d at page 971, "[A]nonymous juries may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence.  Also, . . . the use of an anonymous jury may interfere with defendants' ability to conduct voir dire and to exercise meaningful peremptory challenges, thereby implicating defendants' Sixth Amendment right to an impartial jury.  We nevertheless agree with our sister circuits that the use of anonymous juries is permissible in limited circumstances."

The federal courts have identified five factors for courts to consider in determining whether to empanel an anonymous jury: "(1) [T]he defendants' involvement in organized crime, (2) the defendants' participation in a group with the capacity to harm

15

jurors, (3) the defendants' past attempts to interfere with the judicial process, (4) the potential that, the defendants will suffer a lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." (*Shryock, supra*, 342 F.3d at p. 971; accord, *Portillo, supra*, 969 F.3d at p. 162; *Dinkins, supra*, 691 F.3d at p. 373.) "However, this list of factors is not exhaustive, nor does the presence of any one factor or set of factors automatically compel a court to empanel an anonymous jury." (*Dinkins*, at p. 373; see *Shryock*, at p. 971 ["These factors are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances."].) Federal courts of appeal review the district court's decision to empanel an anonymous jury for an abuse of discretion, as do we. (*Portillo*, at p. 162; *Dinkins*, at p. 371; *Shryock*, at p. 970-971; see *Thomas, supra*, 53 Cal.4th at p. 787 [applying abuse of discretion standard].)

Because the use of an anonymous jury implicates a defendant's constitutional rights, we review the erroneous use of an anonymous jury under the standard established in *Chapman v. California* (1967) 386 U.S. 18, 24 of whether the error was harmless beyond a reasonable doubt. (*Phillips, supra*, 56 Cal.App.4th at p. 1310 [trial court's error in using an anonymous juror was harmless under *Chapman* because defense counsel had substantial information about prospective jurors on which he could evaluate the prospective jurors before exercising his peremptory challenges]; see *People v. Aledamat* (2019) 8 Cal.5th 1, 3 [*Chapman* beyond a reasonable doubt standard

16

applies to federal constitutional error].)[11]  Under this standard it is the People's burden "to show that any federal errors are harmless beyond a reasonable doubt."  (*People v. Jackson* (2014) 58 Cal.4th 724, 748; see *Chapman, supra,* 386 U.S. at p. 24 ["constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless"].)

3.     *The trial court abused its discretion in withholding the jurors' names from counsel*

Lopez contends the trial court erred in withholding prospective jurors' names because there was no good cause for concealment and the court infringed on Lopez's rights by advising the jurors their names were being concealed in part out of a

---

[11]     Lopez contends the use of an anonymous jury was structural error requiring per se reversal because it denied him a public trial.  But as the *Goodwin* court noted in rejecting this argument, the voir dire was held in open court, and "[t]he jurors' faces were visible to anyone who cared to visit the courtroom.  The trial was public in every practical and constitutional sense."  (*People v. Goodwin, supra*, 59 Cal.App.4th at p. 1093.)  Further, although use of an anonymous jury implicates a defendant's right to a fair trial and due process, the error is capable of being quantitatively assessed, and thus is not structural error, which the Supreme Court has described as an error "'that go[es] to the very construction of the trial mechanism—a biased judge, total absence of counsel, [or] the failure of a jury to reach any verdict on an essential element.'"  (*People v. Anzalone* (2013) 56 Cal.4th 545, 554; see *Arizona v. Fulminante* (1991) 499 U.S. 279, 309-310 [structural errors, such as absence of an impartial judge or deprivation of the right to counsel or self-representation at trial, are those that "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself"].)

concern for their security.  The People argue the trial court did not abuse its discretion because it properly considered its own experience and that of other judges in the building with attorneys researching juror backgrounds on the Internet, as well as that Lopez faced a life sentence and a reporter was in the courtroom the prior day.  Lopez has the better argument.

As discussed, section 237, subdivision (a)(2), only authorizes the sealing of juror identifying information upon the recording of the jury's verdict.  Even if we apply the standard in section 237, subdivision (b), for a "compelling interest" against disclosure at the voir dire stage, the trial court did not make a finding under this subdivision of a need to "protect[] jurors from threats or danger of physical harm."  (*Ibid*.)  The facts in this case are in stark contrast to those in *Thomas, supra*, 53 Cal.4th at page 788, in which two witnesses had been threatened and one had been offered a bribe.  Here, there was no evidence of any danger of physical harm or likely interference with the prospective jurors if their names were disclosed.  Thus, there was no basis under section 237 to keep the prospective jurors' names concealed from counsel.  (See *Phillips, supra*, 56 Cal.App.4th at pp. 1309-1310 [trial court erred in concealing juror identifying information during voir dire without making a finding of a compelling interest requiring the information remain confidential].)

Further, only one of the five factors applied by *Shryock* and other federal courts in reviewing the use of an anonymous jury was present here—that Lopez faced a lengthy period of imprisonment (a life sentence).  This factor alone does not show that Lopez posed a risk to jurors, especially given that his potential life sentence was based on his driving under the influence, not an act involving physical violence or a gang or

18

other criminal enterprise.  Thus, the reasoning underlying this factor is diminished here—that a mandatory life sentence "provide[s] a strong inducement to resort to extreme measures in any effort to influence the outcome of the[] trial." (*DeLuca, supra*, 137 F.3d at p. 32.)  By contrast, federal courts have upheld the use of anonymous juries where the defendant faced a life sentence *and* the defendant's background and case-specific circumstances presented a risk to prospective jurors.  (See, e.g., *Portillo, supra*, 969 F.3d at p. 162 [defendants were "'deeply'" involved in organized crime; the culture of their criminal group was to instill fear of reprisal for cooperating witnesses; the criminal group had a history of encouraging violence against outsiders; and six of the charges carried life sentences]; *Shryock, supra*, 342 F.3d at p.  972 [defendant was involved in "an extraordinarily violent organized criminal enterprise"; he took part in several murders, attempted murders, and conspiracies to commit murder; and he had previously threatened, assaulted, killed, or attempted to kill potential witnesses in other cases]; *DeLuca,* at pp. 31-32 [defendants were linked to organized crime, were involved in prior violent crimes, and attempted to tamper with witnesses and suborn perjury].)

According to the probation report, Lopez was employed and had no criminal record other than his prior misdemeanor conviction for driving under the influence.  Nor was there any evidence he had a gang affiliation or otherwise posed a danger to the jury.  Depriving a defendant of the names of prospective jurors based simply on the length of the potential sentence in the absence of other risk factors, as the trial court did here, would mean all defendants charged with murder would be tried by an anonymous jury because they would always face a mandatory life sentence.  (See Pen. Code, § 190.)

19

The trial court also improperly relied on its general policy to use anonymous juries (after consulting with other judges in the building) based on the ease with which attorneys could use social media to learn additional information about jurors and potentially contact them, and the fact 10 years earlier a defense attorney had researched prospective jurors on the Internet. These concerns are not based on the actual risk to prospective jurors in a specific case. (See *Dinkins, supra*, 691 F.3d at pp. 358, 372 ["The decision to empanel an anonymous jury and to withhold from the parties biographical information about the venire members is, in any case, 'an unusual measure' [citation], which must be plainly warranted by the particular situation presented."]; *United States v. Sanchez* (5th Cir. 1996) 74 F.3d 562, 564-565 [trial court abused its discretion in using anonymous jury in criminal case against police officer based on generalized concern there could be jury tampering during 10-day trial recess absent evidence defendant had attempted to interfere with judicial process or witnesses or posed other risk to jurors].)

Further, as Lopez points out, the court could have addressed its concern about attorneys using social media to obtain additional information about jurors and contact them by admonishing the attorneys, who are officers of the court, to avoid any contact with the jurors (and avoid invasive research) and, as defense counsel noted was the practice in other courts, by requiring the attorneys to leave the juror lists in the courtroom.

The only other finding the court made specific to this case was that a reporter for a newspaper was in the courtroom the prior day taking notes. The presence of a lone reporter in the courtroom does not constitute the type of "extensive publicity" the federal courts have found supports juror anonymity. (See *United States v. Edwards* (5th Cir. 2002) 303 F.3d 606, 614 ["the most

20

important factor in the district court's analysis . . . was the intense media interest and highly charged emotional and political fervor that surrounded the trial" as a result of extortion, fraud, and money laundering charges against former governor, his son, and his associates]; *Shryock, supra*, 342 F.3d at p. 972 [trial involving Mexican Mafia "could expect to receive extensive publicity, enhancing the possibility that jurors' names would become public and expose them to intimidation and harassment"]; *DeLuca, supra*, 137 F.3d at p. 32 ["trial was prominently and extensively covered by local print and electronic media . . . to the degree that any public disclosure of the jurors' identities would have enhanced the practicability, hence the likelihood, of efforts to harass, intimidate, or harm the jurors"].)[12]

Finally, the trial court took no precautions to minimize the risk the jury would perceive Lopez was dangerous. "As to the presumption of innocence, federal cases have recognized that 'the danger that the jury might infer that the need for anonymity was attributable to the defendant's character is minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities.'" (*Thomas, supra*, 53 Cal.4th at p. 788 [prejudice to defendant was minimized by trial court's explanation numbers were used to protect jurors' privacy in light of media interest], quoting *United States v. Ross* (11th Cir. 1994) 33 F.3d 1507, 1520 [district court properly minimized prejudicial effect on defendant by explaining it used numbers to insulate jurors from improper communications from either side and was

---

[12]    In addition, to the extent the trial court believed there would be extensive media coverage of the trial, the court could have ordered disclosure of the jurors' names to the attorneys but not the public, to minimize any prejudice to Lopez.

not a reflection on the defense]; see *Shryock, supra*, 342 F.3d at p. 972 [court minimized prejudice to defendant by instructing the jury that the reason for their anonymity was to protect their privacy from "curiosity-seekers"].)  Here, the court advised the prospective jurors they would be identified by the last four digits of their badge numbers "to protect [their] privacy and [their] security."  Thus, far from minimizing any risk Lopez posed to the jury, the court highlighted possible security concerns, although it did not specifically connect those concerns to Lopez.

4.      *The erroneous withholding of prospective jurors'*
        *names was harmless*

Lopez contends the withholding of the names of prospective jurors prevented him and his attorney from researching the background of the jurors to evaluate their qualifications and determine whether they had concealed any information from the court that would show bias.[13]  We recognize there is some

---

[13]      Lopez also argues he was denied the ability to discover possible juror bias from the jurors' names, pointing to "cultural associations" between jurors' names and Lopez's name, the "symbolic and social meanings that give [the names] significance in ways that transcend ethnic identification," and the ability of Lopez to use his "intuition" based on a juror's name to discern the juror's bias.  But Lopez fails to provide any specifics as to how the etymology of the jurors' names would have assisted Lopez in ferreting out juror bias.  Although the jurors' surnames may have revealed their ethnicities, as Lopez acknowledges, a juror's ethnicity is not a valid basis for a peremptory challenge.  (*People v. Armstrong* (2019) 6 Cal.5th 735, 765; *Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276.)  The list of jurors' names may be important to buttress a

potential benefit to a defendant from the ability of his or her attorney to research the jurors' backgrounds using their names. But as the People point out, the trial court elicited a significant amount of information about each prospective juror, including his or her area of residence, marital status, employment, family background, and prior jury experience. The jurors were also asked to respond to multiple questions eliciting their views and practices relating to the consumption of alcoholic beverages and driving under the influence, including whether they belonged to any organizations that advocated for changes in the law on those subjects. The court also requested the jurors disclose whether they knew any of the witnesses in the case. Further, Lopez's attorney had an extensive opportunity to inquire into any bias a juror may have had and to elicit additional information that could have revealed the juror's withholding of relevant facts.[14]

---

defendant's challenge to the improper excusal of a juror based on race or ethnicity, but Lopez does not argue the information was needed for that purpose here. Nor does Lopez argue that knowing the jurors' ethnicities (to the extent it was not ascertainable from talking to the jurors) would have affected how he presented his case.

[14] Lopez argues the trial court's explanation to the jury that the use of professional jurors would create a "greater chance of graft or corruption" suggested that if jurors' names were disclosed, Lopez would attempt to corrupt the jury. Whether or not a reasonable juror would interpret these comments as suggesting Lopez would attempt to corrupt the jury (as opposed to an attempt by the prosecutor, the victim's family, the media, or others), the comments were ill advised. Lopez argues these comments prejudiced him, but any such prejudice did not flow from the trial court's use of an anonymous jury. Had the court

23

Thus, the People have met their burden on this record to show that the trial court's error in concealing the jurors' names from the attorneys did not prejudice Lopez's ability to obtain adequate information about the jurors necessary to conduct an effective voir dire. Further, Lopez has not pointed to any examples of a juror's response that suggested the juror was not forthcoming with his or her answers or any areas of inquiry Lopez's attorney was not allowed to explore.[15]

Although the trial court improperly referred to the need to protect the jury's security, the court did not tell the jurors in what manner their security was at risk (for example, from Lopez or the public). If anything, by telling the jurors they needed to wear their badges throughout the courthouse, this suggested the security risk was from a source other than Lopez. Given the

provided the attorneys the names of the jurors, but identified the jurors by numbers in the courtroom, the court's comments would have had the same effect. Thus, this is not a basis for concluding the error in using an anonymous jury was prejudicial. And Lopez does not argue on appeal that his conviction should be reversed based on the court's comments about professional juries.

[15] If Lopez believed that a juror was concealing information or providing false answers, he could have moved posttrial under section 237, subdivision (b), to obtain the names of the jurors and used that information to show a juror harbored bias, failed to disclose relevant information, or presented false information to the court. (See *Phillips, supra*, 56 Cal.App.4th at p. 1310 [noting as part of harmless error analysis that defendant failed to seek disclosure of names of jurors after trial to support his argument of prejudice].) As in *Phillips*, Lopez did not seek posttrial disclosure of the juror names to support his argument of prejudice.

24

nature of the charges and the absence of any indicia Lopez had a violent background, there was no other reason for the jury to suspect Lopez was dangerous. Although Lopez argues the court's statement that it was protecting the jurors' privacy, when combined with a reference to their security, would cause jurors to fear Lopez, he does not provide any reason why a statement about the jurors' privacy would cause them to think Lopez was dangerous, as opposed to the more likely explanation that revealing their names could cause them to be contacted by either side, the media, or a spectator.

Under these circumstances, the trial court's error in withholding prospective jurors' names was harmless beyond a reasonable doubt. (See *Phillips, supra*, 56 Cal.App.4th at p. 1310 [use of anonymous jury was harmless beyond a reasonable doubt where counsel had substantial information about the prospective jurors including where they lived; their occupations, families, and prior jury experience; their knowledge of the witnesses, parties, or counsel; and whether they had been victims of a crime or charged with a crime, and defense counsel could have requested the trial court inquire further of jurors]; *People v. Goodwin, supra*, 59 Cal.App.4th at p. 1092 ["any prejudice in the ability to select a jury [as a result of use of an anonymous jury] is not assumed but must be established, principally by analysis of the voir dire"]; *United States v. Mansoori* (7th Cir. 2002) 304 F.3d 635, 651-652 [use of anonymous jury was harmless error where there was some basis for concealment of jurors' names, the trial judge conducted a 'searching and thorough' voir dire, and defendants did not identify any areas where court's voir dire was inadequate].)

25

B.  *The Admission of Lopez's Jail Call with His Sister Was Not an Abuse of Discretion*

1.  *Proceedings below*

Lopez filed a motion prior to trial to exclude his jail call with his sister. In a pretrial hearing, Lopez's attorney argued the statement should be excluded because the jury would understand the statement to mean he was admitting he murdered someone. Further, the statement was more prejudicial than probative because Lopez likely learned that Edinburgh died from the police officer, not from personal knowledge. The prosecutor responded that the statement was admissible as a statement against penal interest[16] and it showed Lopez was the driver of the vehicle that caused the collision. The trial court denied Lopez's motion, ruling the statement was relevant to prove the identity of the driver and therefore "clearly goes to something that is relevant to the charges . . . ."

2.  *The trial court did not abuse its discretion*

Lopez contends the trial court abused its discretion in admitting the jail call because Lopez's admission that he was the driver was cumulative to other evidence and the call was more

---

[16]  Evidence Code section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

26

prejudicial than probative.  The trial court did not abuse its discretion.

"'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'"  (*People v. Hardy* (2018) 5 Cal.5th 56, 87 (*Hardy*); accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.)  "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  (Evid. Code, § 352.)"  (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105 (*Bell*).)  Evidence "*may* have a lower probative value if it is merely cumulative of other evidence [citations] and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time."  (*People v. Holford* (2012) 203 Cal.App.4th 155, 178, fn. 14; see *People v. Pride* (1992) 3 Cal.4th 195, 235 [under section 352 "a trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming"]; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 244 [in determining probative value of evidence, "courts also look to whether the evidence . . . is cumulative"].)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to

27

evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *Bell, supra*, 7 Cal.5th at p. 105 ["'"Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].)  "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*Hardy, supra*, 5 Cal.5th at p. 87; accord, *Bell*, at p. 105.)

Lopez argues there was significant evidence other than the jail call showing he was driving the Toyota Matrix.  Lopez's uncle testified he loaned the Toyota Matrix to Lopez shortly before the accident, and Lopez admitted to Officer Ramos the car belonged to his uncle and was a "loaner."  Lopez told Officer Ramos the other car was stopped in the middle of the freeway and he "hit it."  When Deputy Sanchez asked Lopez if he was driving the Toyota Matrix, Lopez responded, "Yes, absolutely."  Thus, we agree with Lopez that the probative value of his admission to show he was the driver of the Toyota Matrix was minimal.  However, the prejudicial effect of the statement was also minimal.  As the People point out, Lopez did not admit he had committed murder, only that he had caused the death of Edinburgh by colliding with Edinburgh's car.  The central issue at trial was not whether Lopez caused the collision, but whether he acted with implied malice in that the natural and probable consequences of his driving under the influence of alcohol were dangerous to human life, Lopez knew at the time of the collision his act of driving under the influence was dangerous to human life, and he

deliberately acted with conscious disregard for human life.  (See CALCRIM No. 520.)  Lopez argues his statement that he had killed someone was made in the context of a conversation with Sarah about posting bail, which made him seem callous as to the death of Edinburgh.  But it is not reasonable to believe Lopez's statement to Sarah explaining he was in custody because he killed someone would confuse or mislead the jury to think he was indifferent at the time of the collision to whether his driving would cause the death of Edinburgh.  On these facts, the trial court did not abuse its discretion in admitting the jail call.  (*Bell, supra*, 7 Cal.5th at p. 105; *Hardy, supra*, 5 Cal.5th at p. 87.)

## DISPOSITION

The judgment is affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

29